CHARLES F. SCRIBNER ET AL. *v.* O'BRIEN, INC., ET AL.

HOUSE, C. J., LOISELLE, MACDONALD, BOGDANSKI and LONGO, Js.

Argued March 6—decision released August 26, 1975

*Melvin J. Silverman,* for the appellants (defendants).

*James R. Fogarty,* with whom, on the brief, was *James J. Huron,* for the appellees (plaintiffs).

BOGDANSKI, J. The plaintiffs brought this action to recover damages for the cost of repairing a drainage problem and other defects allegedly created by the defendants during construction of their

new dwelling house. The action, in three counts — breach of express warranty, negligence, and breach of implied warranty — was referred to a referee, who, acting as the court, rendered judgment for the plaintiffs on all three counts. The defendants have appealed, assigning error in the court's refusal to find facts claimed to be admitted or undisputed, in finding facts without evidence, in the conclusions reached, and in rulings on evidence.

The defendants' attack on the finding is all-encompassing. It is claimed that the court refused to find twenty-eight paragraphs of the defendants' draft finding which were "admitted or undisputed"; that twenty-five of the facts found are not supported by the evidence; and that not one of the trial court's fourteen conclusions finds support in the subordinate facts. We have repeatedly stated that such wholesale attacks rarely produce results, tend to cloud the real issues, and in themselves cast doubts on the appellants' claims. See, e.g., *Dick* v. *Dick,* 167 Conn. 210, 212, 355 A.2d 110; *John Meyer of Norwich, Inc.* v. *Old Colony Transportation Co.,* 164 Conn. 633, 634, 325 A.2d 286; *State* v. *Miselis,* 164 Conn. 110, 114, 318 A.2d 102; *Branford Sewer Authority* v. *Williams,* 159 Conn. 421, 424, 270 A.2d 546. We have, nevertheless, scrutinized the assignment of errors and have determined that only two corrections in the finding of fact are warranted. Those will be discussed in the opinion. The remaining requested additions are either not material to the issues presented on appeal or are not admitted or undisputed facts; *Starkel* v. *Edward Balf Co.,* 142 Conn. 336, 337, 114 A.2d 199; Practice Book § 628 (a); and the remaining findings sought to be deleted find ample support in the evidence printed in the well-arranged appendix to the plain-

tiffs' brief.[1]  *Hydro-Hercules Corporation* v. *Gary Excavating, Inc.*, 166 Conn. 647, 649 n.1, 353 A.2d 714; Practice Book § 718. Facts will not be deleted from the finding if they are either directly supported by the evidence or are based on inferences reasonably drawn therefrom. *Cappiello* v. *Haselman*, 154 Conn. 490, 492, 227 A.2d 79.

The finding discloses that in July, 1967, the plaintiffs first viewed the subject property. At that time, no house had been constructed, although there was an excavation and possibly a poured foundation on the lot. There was a "for sale" sign on the property which informed prospective purchasers that they should contact a certain real estate agent. The plaintiffs telephoned that real estate agent who arranged an appointment with the defendant O'Brien. They met with O'Brien on July 28, 1967, and discussed certain plans for the erection of a dwelling on the subject land. At the conclusion of that meeting, the plaintiff Charles

[1] For example, error was assigned in the trial court's findings that the defendant O'Brien supervised the construction of the house; that he was present at the subject property on a daily basis during that construction from its beginning to its end; and that the named defendant was engaged in the business of constructing houses at all relevant times. The defendants claim that there is no evidence in the transcript to support those findings, either directly or by inference. Yet, it appears from the plaintiffs' appendix that the defendant O'Brien, president of the named defendant, testified that he did supervise the construction of the house; that he was present at the subject property on a daily basis from the inception of construction in May, 1967, until its completion in October, 1967; and that the named defendant was engaged in the business of constructing houses. The transcript, which was consulted because of the obvious discrepancy between the defendants' claim and the plaintiffs' appendix, shows that the defendant O'Brien did testify to the facts set forth in the finding. See Practice Book § 721; *Baton* v. *Potvin*, 141 Conn. 198, 200, 104 A.2d 768. It is difficult to refrain from further comment on the time wasted in reviewing such groundless assignments of error.

Scribner executed an instrument entitled "Binder of Sale Form" which purported to be an agreement between Scribner and O'Brien, individually, wherein the former agreed to buy and the latter agreed to sell the property. Scribner tendered $300 as a "binder" for the property and O'Brien gave him a receipt for the money.

In August of 1967, the plaintiffs entered into a bilateral contract to purchase the property. That contract purported to be an agreement between both plaintiffs, described as "buyer," and "O'Brien, Inc., a Connecticut corporation with its principal place of business in the town of Westport, . . . acting herein by Harry O'Brien, its president, and Harry O'Brien of . . . Westport." Both defendants were described as "seller," according to the terms of the contract. That contract also provided that the "seller" would erect a house in accordance with specified plans and provide, among other things, a crushed stone driveway. The trial court found that the defendant O'Brien signed the contract over a signature line marked "seller." We must also add, however, a requested draft finding that the name "Harry O'Brien," which was added to the contract with a space for his personal signature, was stricken and not signed. Our examination of the contract for sale reveals that the signature of O'Brien, which the trial court found to be over the line marked "seller" was also under a line marked "O'Brien, Inc." Thus, the signing by O'Brien was not in his individual capacity; rather, it was in his capacity as president of the named defendant.[2] The

---

[2] The signature block of the contract which O'Brien signed was as follows:

        "O'BRIEN, INC.

        By..............................

           Harry O'Brien, President
           Seller"

contract included the following warranty: "The Seller agrees that it will, upon written request within twelve months from the date of closing of title, inspect the dwelling as promptly as possible and, where shown by such inspection to require adjustment by reason of defects in workmanship or material, the Seller will make reasonable and necessary repairs or adjustments without cost to the Buyer."[3]

The plaintiffs subsequently acquired title to the property and took possession of the then completed house in late October, 1967. At that time gravel had been placed on the driveway and it looked "lovely" to the plaintiffs. Within one month the plaintiffs began to notice surface water, the property became very muddy in the rear, and the 170 foot gravel driveway began to sink. By December of 1967, the water problem was so severe that the plaintiffs' car sank in the driveway up to its hub-caps. The driveway became completely unusable, with the gravel thereon sinking below the surface of the mud. Several times each week, the plaintiffs had to pump water out of their garage, which, in any event, could no longer be used because of the condition of the driveway. The plaintiffs also had to install wooden planks from their front porch over to their neighbor's driveway in order to gain access to the home.

In the spring of 1968, the plaintiffs notified the defendant O'Brien of the critical mud and water condition on their property. O'Brien inspected the property but disclaimed liability, claiming that the

---

[3] The words of the written contract have been substituted for the trial court's finding in order to correct the finding which erroneously described the warranty as extending to "the property" instead of to "the dwelling."

water problem was a "natural occurrence." From midsummer of 1968 to November, 1968, the water condition dried up, but it reappeared in the winter of 1968–1969, and once again the driveway and garage were rendered totally unusable.

The trial court further found that O'Brien, who was president of the named defendant, acquired the subject property in his own name in May of 1967; that he supervised the construction of the dwelling; that he was present at the property on a daily basis from the beginning to the end of that construction; and that the named defendant was, at all revelant times, engaged in the business of constructing homes. During the course of that construction, the defendants encountered a water problem which forced them to modify the plans for the house, to use pumps to remove water from the excavation site, and to dig a channel from the foundation of the house to the public highway. And, in the course of excavating about 250 cubic yards of topsoil and subsoil, the property was so wet that the defendants were, at times, unable to use heavy construction machinery. The excavation and removal of the topsoil and subsoil by agents of the defendant O'Brien lowered the grade level of the property so that it became lower than the level of abutting land.

In the fall of 1968, the plaintiffs sought the assistance of Neil Callahan, an excavating contractor and builder with twenty-five years of experience. Callahan estimated that the repair work necessary to remedy the water problem would cost $1900. He subsequently installed drainage pipes around the plaintiffs' house and down their driveway and replaced the gravel in the driveway at a

total cost of $1992:62. The plaintiffs paid the cost of those repairs and never again encountered any trouble with water on the property. The trial court found that the cost of those repairs was reasonable.

During his work on the property, Callahan observed that the water causing the problem was running out of the sides of the property, out of the bank in the back of the lot and out of the land itself. There was also a full flow of water onto the plaintiffs' land from drainage pipes which may have come from abutting property. Callahan testified that it was unusual to have the amount of water found on the plaintiffs' lot and that it was his opinion that the defendants should have provided a permanent drainage system at the time of the original construction of the dwelling. The trial court accepted that opinion in its finding of fact.

On the basis of the foregoing, the trial court concluded that the water problem was caused by the defendants' excavation of the property;[4] that the defendants had knowledge of the presence of excess water on the property during the excavation of the property and construction of the dwelling; and that the defendants' failure to install a drainage system around the dwelling and garage resulted in the excessive accumulation of water on the driveway. The trial court also concluded that the defendant O'Brien was personally liable under the terms of the August, 1967 contract; that he individually owned the property from May 9, 1967, until its transfer to the plaintiffs on October 23, 1967; and that both defendants obligated themselves under the terms of the July, 1967 "binder" and the August, 1967 contract. The issues were then found for the

[4] The conclusion of causation was erroneously set forth in the findings of fact.

plaintiffs against both defendants, with the ultimate conclusions that the defendants had breached their express warranty to make reasonable and necessary repairs; that the defendants were negligent in failing to install a sufficient drainage system to carry off the accumulated water from the driveway; and that the defendants breached their implied warranty that the dwelling, garage and driveway would be constructed in a workmanlike manner. The plaintiffs were awarded damages of $1,992.62 for the cost of repairs and $547.54 in interest "for the loss of use of their money."

"The conclusions reached by the trial court are tested by the finding and must stand unless they are legally or logically inconsistent with the facts found or unless they involve the application of some erroneous rule of law material to the case. *Klein* v. *Chatfield,* 166 Conn. 76, 80, 347 A.2d 58." *Hydro-Hercules Corporation* v. *Gary Excavating, Inc.,* 166 Conn. 647, 654, 353 A.2d 714. As we noted previously, the defendants have assigned error in each and every conclusion reached by the trial court, claiming that the conclusions are not supported by the facts found. In addition, error has been assigned in the rules of law applied by the trial court and in the overruling of all sixteen of the defendants' claims of law. Some of those assignments of error have not been briefed, while others have received only passing mention. Nevertheless, substantial issues have been raised which are not clouded by the wholesale nature of the attack, and those will be considered.

## I

The defendants claim that there was no express warranty in the contract covering the serviceability

of the driveway or the condition of the land; that the covenant to make reasonable and necessary repairs extended only to defects in the dwelling; and that the trial court erred in concluding that they were liable for breach of express warranty. Insofar as the court's conclusion was based on the covenant contained in the August, 1967 contract to make "reasonable and necessary repairs without cost to the buyer," we must agree with the defendants that the corrected finding does not support a determination of liability. The covenant referred only to defects in material or workmanship disclosed by an inspection of "the dwelling." It is true that the word "dwelling" is not free from ambiguity. " 'It may mean one thing under an indictment for burglary or arson, and another under a homestead law, and another under a pauper law, and another under a contract or a devise.' Robbins v. Bangor Ry. & Electric Co., 100 Me. 496, 501 [62 A. 136]." Woodstock v. The Retreat, Inc., 125 Conn. 52, 58, 3 A.2d 232; 28 C.J.S., Dwelling or Dwelling House, pp. 599–600. "Dwelling" can refer to everything within the curtilage, and that is the common-law rule; see Italian-American Building & Loan Assn. v. Russo, 132 N.J. Eq. 319, 323, 28 A.2d 196, and other cases cited in 13A Words & Phrases 561, 575; 28 C.J.S., Dwelling or Dwelling House, p. 602; however, its popular and commonly used meaning today is "a building or construction used for residence." Webster's Third New International Dictionary, p. 706. See Neptune Park Assn. v. Steinberg, 138 Conn. 357, 362, 84 A.2d 687. The intention of the parties is to be ascertained from the language used in the contract and that language must be given its common meaning and usage where it can be sensibly applied to the subject matter of the contract.

*Anderson* v. *Pension & Retirement Board,* 167 Conn. 352, 355 A.2d 283, and cases cited therein. We therefore conclude that the common meaning and usage of "dwelling" must be given effect; that the covenant to repair did not extend to the condition of the surrounding land and driveway; and that the trial court erred in awarding damages for the condition of the driveway on the theory of breach of express warranty.[5]

## II

The defendants also assert that the trial court erred in concluding that they were negligent in the construction of the dwelling and its facilities. Their total argument on that issue is contained in a single paragraph on one page of their brief. The defendants claim, for the first time on appeal, that the plaintiffs failed to set forth any specifications of negligence in their complaint. It is sufficient to point out that the plaintiffs alleged that the defendants' negligent construction of the dwelling and its facilities caused the water condition which rendered the driveway unusable. The defendants could have sought a more particular description of the negligence charged through a motion for a more specific statement. See *Doerr* v. *Woodland Transportation Co.,* 105 Conn. 689, 693, 136 A. 693; *Eckert* v. *Levinson,* 91 Conn. 338, 341, 99 A. 699.

---

[5] We recognize that the attached garage may have been, in the contemplation of the parties, a part of the "dwelling" and that an inspection of the garage would have disclosed a defect in workmanship, i.e., flooding caused by the excavation of the surrounding land and the failure to provide adequate drainage. The damages in this case, however, were based on the cost of repair not only to correct the flooded garage, but also to correct the water condition on the driveway. As such, the total damages awarded cannot be based on the plaintiffs' claim that the defendants breached their covenant to repair.

By answering the allegation of negligence with a denial and proceeding to contest the merits of that issue, the defendants have waived any right now to attack the complaint on that ground. See *Anderson v. United States Rubber Co.,* 78 Conn. 48, 52, 60 A. 1057; Practice Book § 652.

The defendants' only other claim directed at the negligence count is that "no . . . standard [of care] has ever been shown in the case in question and none is set forth in any finding of the court." "A party may be liable in negligence for the breach of a duty which arises out of a contractual relationship. See *Urban v. Hartford Gas Co.,* 139 Conn. 301, 304, 93 A.2d 292; see also *Kaplan v. Merberg Wrecking Corporation,* 152 Conn. 405, 410, 207 A.2d 732." *Sasso v. Ayotte,* 155 Conn. 525, 529, 235 A.2d 636. When the defendants undertook to erect a dwelling and provide a driveway for the plaintiffs they were under a duty to exercise that degree of care which a skilled builder of ordinary prudence would have exercised under the same or similar conditions. See *Sasso v. Ayotte,* supra; *Goodrich Oil Burner Mfg. Co. v. Cooke,* 126 Conn. 551, 553, 12 A.2d 833; *Ferrie v. Sperry,* 85 Conn. 337, 343, 82 A. 577.

In this case, the defendants held themselves out to be skilled builders. The defendant O'Brien was present at the property on a daily basis supervising the excavation of the land and construction of the dwelling. During the course of that excavation and construction a severe water problem existed on the land which caused the defendants to modify the plans for the house, to use pumps, to dig a channel to the public highway, and to curtail their use of heavy construction machinery. The trial court,

therefore, could properly conclude that both defendants had actual notice of the presence of a water problem on the property during the excavation and construction of the dwelling. Contrary to the defendants' claim, the trial court did find that under those circumstances the defendants should have provided a drainage system at the time of construction in the same manner in which it was ultimately provided. While that finding was attacked by the defendants as unsupported by the evidence, we find it to be amply supported in the plaintiffs' appendix by the testimony of the plaintiffs' expert witness, Callahan, who had twenty-five years of experience as a builder and excavating contractor. Callahan testified that it was a common practice to install underground drains in the area of the subject property; that a drain around the perimeter of the house was very necessary for homes constructed in that area; that the amount of water on the subject land was unusually great; that when a builder knows he is dealing with a wet lot he should put drains around the driveway; and that had he been the builder of the subject dwelling, he would have initially installed the drainage system which he ultimately did install. The defendants did not offer any evidence to rebut the testimony of Callahan or to establish a different standard of care. From Callahan's testimony the trial court could reasonably conclude that the defendants' failure to install a drainage system was a failure to exercise that degree of care which a skilled builder of ordinary prudence would have exercised under the circumstances. The claims made by the defendants are therefore without merit.

In a remarkably similar case, the Supreme Court of Kansas held that there was ample evidence to

support a jury verdict for the plaintiff home-buyers and against the defendant builder-vendors on the theory of negligence. *McFeeters* v. *Renollet,* 210 Kan. 158, 166, 500 P.2d 47. In that case there was testimony that the reasonably prudent builder would have made tests to determine the level of the water table in an area where drainage problems existed; that the defendants failed to do so; that they failed to install an adequate drainage system; and that the result was flooding of the plaintiffs' basements. For other cases holding builder-vendors liable for negligence or approving such a cause of action see the annotation at 25 A.L.R.3d 383, 397–405, as supplemented. See also Prosser, Torts (4th Ed.), pp. 412–14, 680–82.

The trial court also concluded that "[t]he defendants impliedly warranted that the building and the facilities would be constructed in a workmanlike manner, and the absence of a drainage system violated and breached that implied warranty." We are requested by the defendants to apply the doctrine of caveat emptor in this case and to rule that no implied warranties can survive the passage of title from the builder-vendor to the buyer. Since we have found no error in the trial court's conclusion that the defendants were liable for negligence, there is no need to reach this claim, although we note that the overwhelming trend in recent decisions from other jurisdictions, as well as in our own Superior Court, is to invoke the doctrine of implied warranty of workmanship and habitability in cases involving the sale of new homes by the builder. See, e.g., *City of Philadelphia* v. *Page,* 363 F. Sup. 148 (E.D. Pa.); *Vernali* v. *Centrella,* 28 Conn. Sup. 476, 266 A.2d 200; *Theis* v. *Heuer,* 280 N.E.2d 300 (Ind.); *Yepsen* v.

*Burgess,* 269 Ore. 635, 525 P.2d 1019; *Elderkin* v. *Gaster,* 447 Pa. 118, 288 A.2d 771; *Padula* v. *J. J. Deb-Cin Homes, Inc.,* 111 R.I. 29, 298 A.2d 529; *Hollen* v. *Leadership Homes, Inc.,* 502 S.W.2d 837 (Tex. Civ. App.), and cases collected at 25 A.L.R.3d 383, 413–19, as supplemented.

## III

The defendants next claim that the trial court erred in finding the defendant O'Brien individually liable to the plaintiffs. The main thrust of the defendants' argument is that O'Brien did not sign the August, 1967 contract for sale in his individual capacity, and that under § 52-550 of the General Statutes no action can be maintained unless the party to be charged has signed the contract. That argument, based on the Statute of Frauds, is not applicable in this case. First, the contract for sale was performed to the extent that O'Brien, who owned the subject property in his individual capacity, conveyed the real estate to the plaintiffs in October of 1967, at which time they took possession. The doctrines of full performance by one party to a contract or part performance by the party seeking to enforce the contract for sale of real estate will take it out of the Statute of Frauds. See *Rutt* v. *Roche,* 138 Conn. 605, 606, 87 A.2d 805; *Strang* v. *Witkowski,* 138 Conn. 94, 99, 82 A.2d 624; *Haussman* v. *Burnham,* 59 Conn. 117, 133, 22 A. 1065.

Second, the trial court concluded that both defendants were negligent during the construction of the dwelling and driveway. It is clear that O'Brien was present at the property on a daily basis, that he undertook to supervise the construction, and that he failed to act with reasonable care

in that undertaking. Whether O'Brien was acting in his individual capacity or as an officer and agent of the named defendant, he is still liable to the plaintiffs for his participation in the negligence complained of. It is true that the agent is not liable where, acting within the scope of his authority, he contracts with a third party for a known principal. See *Castaldo* v. *D'Eramo,* 140 Conn. 88, 92, 98 A.2d 664; *Whitlock's, Inc.* v. *Manley,* 123 Conn. 434, 437, 196 A. 149. It is also true that an officer of a corporation does not incur personal liability for its torts merely because of his official position. Where, however, an agent or officer commits or participates in the commission of a tort, whether or not he acts on behalf of his principal or corporation, he is liable to third persons injured thereby. *First National Bank & Trust Co.* v. *Manning,* 116 Conn. 335, 340, 164 A. 881; *Semple* v. *Morganstern,* 97 Conn. 402, 404, 116 A. 906; *Bennett* v. *Ives,* 30 Conn. 329, 334; see 19 Am. Jur. 2d, Corporations, § 1382. The trial court's conclusion that O'Brien was individually liable to the plaintiffs for his negligence must stand.

## IV

Error has been assigned in the admission of testimony regarding the cost of correcting the water condition on the plaintiffs' property. The defendants objected to that evidence, claiming that the proper test of damages was the difference in the value of the property as constructed as opposed to the value it would have had with a proper drainage system. There is no dispute that the measure of damages for breach of contract may be " 'the difference in the value of the property, upon which structures are to be placed or repairs are to be made, with and without such repairs or struc-

tures. . . . [But when] the party omits to do what he stipulated, it is just, as a reasonable substitute, that he should pay the precise value of the thing which he contracted to do; and such value to be estimated at the time when the act in question should have been executed.'" *Bachman* v. *Fortuna,* 145 Conn. 191, 194, 141 A.2d 477, quoting from *Lee* v. *Harris,* 85 Conn. 212, 214, 82 A. 186. Since two of the three counts in this case were based on breach of contract, there was no error in admitting the testimony as to the cost of repairs. Moreover, in a negligence action the cost of repairs is admissible as proof of the difference in the value of property before and after the damage caused by the defendants' negligent breach of duty. *Bullard* v. *de Cordova,* 119 Conn. 262, 268, 175 A. 673.

The defendants also argue, for the first time on appeal, that the evidence of the cost of repairs was too remote in time from the alleged date of the breach and was therefore not admissible. That argument was not raised as a basis of the defendants' objection before the trial court and consequently should not be considered now. *DuBose* v. *Carabetta,* 161 Conn. 254, 264–65, 287 A.2d 357.

V

The final claim to be considered concerns the trial court's conclusion that "[u]nder the circumstances in this case, the interests of justice require that the plaintiffs be allowed to recover legal interest . . . as damages for the loss of use of their money." The defendants assert that such an award is improper for the reason that the damages were not liquidated until the date of judgment. In rejecting that argument, we point out that the determination of whether interest is a proper

element of damages is to be made in view of the demands of justice, not through the application of any arbitrary rules; that whether a sum of money has been liquidated may be useful, but is not a controlling factor; and that the allowance of interest is primarily an equitable determination to be made within the discretion of the trial court. *Southern New England Contracting Co.* v. *State*, 165 Conn. 644, 664–65, 345 A.2d 550; *Bertozzi* v. *McCarthy*, 164 Conn. 463, 466–67, 323 A.2d 553. "We have uniformly held interest to be allowable from the date of injury on damages resulting from tortious injury to property. *Wells Laundry & Linen Supply Co.* v. *Acme Fast Freight, Inc.*, 138 Conn. 458, 463, 85 A.2d 907; *New York, N.H. & H.R. Co.* v. *Ansonia Land & Water Power Co.*, 72 Conn. 703, 705, 46 A. 157; *Regan* v. *New York & New England R. Co.*, 60 Conn. 124, 142, 22 A. 503." *United Aircraft Corporation* v. *International Assn. of Machinists*, 161 Conn. 79, 107, 285 A.2d 330, cert. denied, 404 U.S. 1016, 92 S. Ct. 675, 30 L. Ed. 2d 663. In the *United Aircraft Corporation* case, supra, 107, interest was not properly awarded from the date of injury for the reason that the amount of loss was difficult to calculate and could not "reasonably be ascertained by due inquiry and investigation on the date from which interest is awarded." In this case, however, the defendants were notified of the water condition, inspected the property and refused to remedy it. Just as the plaintiffs' expert witness, Callahan, was able to estimate accurately the cost of repairs at $1900, the defendants could have reasonably ascertained the cost of remedying the defect at the time of their inspection of the premises. The court did not abuse its discretion in the award of interest.

The defendants' other claims regarding the trial court's conclusions and rulings on evidence lack merit and warrant no further discussion. While the trial court committed error in concluding that the defendants breached their express warranty, the judgment must stand as it is supported by the conclusion that the defendants were negligent.

There is no error.

In this opinion the other judges concurred.