# Ronald K. Johnson *v.* John J. Healy

Cotter, C. J., Loiselle, Bogdanski, Longo and Peters, Js.

Argued June 8—decision released September 5, 1978

*Donald H. Tamis,* with whom, on the brief, was *Joseph N. Perelmutter,* for the appellant-appellee (defendant).

*Neal B. Hanlon,* for the appellee-appellant (plaintiff).

PETERS, J.   This case arises out of the sale of a new one-family house by its builder, the defendant John J. Healy, to the plaintiff, Ronald K. Johnson. The plaintiff bought the house, located in Naugatuck, in 1965, for $17,000.  Between 1968 and 1971, the house settled in such a way as to cause major displacements in various foundation walls, and substantial damage to the sewer lines.   In 1971, the plaintiff instituted this law suit alleging misrepresentation and negligence on the part of the defendant builder-vendor.   The court below found for the plaintiff on the claims of misrepresentation, for the defendant on the claims of negligence, and assessed damages.   The trial court rendered judgment for the plaintiff and both parties have appealed.

I

The claims of misrepresentation are based on the following facts, which are amply supported by the evidence below.  As part of the negotiations leading to the contract of sale of the house, the plaintiff inquired about the quality of its construction.  The defendant replied that the house was made of the best material, that he had built it, and that there

was nothing wrong with it. These representations were relied upon by the plaintiff and induced him to purchase the house. The damage which the house sustained because of its uneven settlement was due to improper fill which had been placed on the lot beneath the building at some time before the defendant bought the lot, as a building lot, in 1963. On the basis of these findings, the trial court concluded that the defendant had made an express warranty coextensive with the doctrine of implied warranty of workmanship and habitability in cases involving the sale of new homes by a builder.

The defendant assigns as error the trial court's refusal to find additional facts claimed to be admitted or undisputed. As we have repeatedly held, this court will not add findings of fact which are not material and could not affect the result reached below. *Rushchak* v. *West Haven,* 167 Conn. 564, 566, 356 A.2d 104 (1975); *Xerox Corporation* v. *Board of Tax Review,* 175 Conn. 301, 304, 397 A.2d 1367 (1978).

The defendant also assigns as error the trial court's conclusion that the defendant bore responsibility for a condition of which he had no knowledge, actual or constructive. The trial court found that the defendant's representations, although innocent, amounted to an express warranty of workmanlike construction and fitness for habitation. Since those representations reasonably induced reliance in the purchase of the house, the defendant was held liable despite the absence of written warranties concerning the fitness or condition of the home in the contract of sale or the deed of conveyance.

The scope of liability for innocent misrepresentation has varied with time and with context, in American law generally and in this court. Traditionally, no cause of action lay in contract for damages for innocent misrepresentation; if the plaintiff could establish reliance on a material innocent misstatement, he could sue for rescission, and avoid the contract, but he could not get affirmative relief. See Restatement (Second), Contracts §§ 304, 306, and Introductory Note to Chapter 13 (Tentative Draft No. 11, 1976). In tort, the basis of responsibility, although at first undifferentiated, was narrowed, at the end of the 19th century, to intentional misconduct, and only gradually expanded, in this century, to permit recovery in damages for negligent misstatements. Prosser, Torts (4th Ed. 1971) § 107. At the same time, liability in warranty, that curious hybrid of tort and contract law, became firmly established, no later than the promulgation of the Uniform Sales Act in 1906. In contracts for the sale of tangible chattels, express warranty encompasses material representations which are false, without regard to the state of mind or the due care of the person making the representation. For breach of express warranty, the injured plaintiff has always been entitled to choose between rescission and damages. Although the description of warranty liability has undergone clarification in the Uniform Commercial Code, which supersedes the Uniform Sales Act,[1] these basic remedial principles remain unaffected. At the same time, liability in tort, even for misrepresentations which are innocent, has come to be the emergent rule for transactions that involve a commercial

---

[1] Uniform Commercial Code §§ 2-313 et seq. replace the corresponding sections, Uniform Sales Act, Public Acts 1907, c. 212 §§ 12 et seq.

exchange. See Restatement (Second), Torts § 552C (1977); Prosser, Torts (4th Ed. 1971) § 107, pp. 710–14.

In Connecticut law, strict liability for innocent misrepresentation in the sale of goods is well established. As long ago as *Bartholomew* v. *Bushnell*, 20 Conn. 271 (1850), this court held (p. 275) that "[i]f a man sell a horse to another, and expressly warrant him to be sound, the contract is broken, if the horse prove otherwise. The purchaser, in such case, relies *upon the contract;* and it is immaterial to him, whether the vendor did, or did not, know of the unsoundness of the horse. In either case, he is entitled to recover all the damages, which he has sustained." For similar reasons, strict liability for innocent misrepresentation was imposed in a construction contract in *E. & F. Construction Co.* v. *Stamford,* 114 Conn. 250, 158 A. 551 (1932). In *Stamford,* the defendant's erroneous description of subsurface conditions materially affected the plaintiff's excavation costs. This court held the misrepresentation to be actionable, even though there was no allegation of fraud or bad faith, because it was false and misleading, "in analogy to the right of a vendee to elect to retain goods which are not as warranted, and to recover damages for the breach of warranty. [Citations omitted.]" Id., 258. *Stamford* quotes, with approval, from 3 Williston, Contracts § 1512, p. 2689 (1920): " 'If a man makes a statement in regard to a matter upon which his hearer may reasonably suppose he has the means of information, . . . and the statement is made as part of a business transaction, or to induce action from which the speaker expects to gain an advantage, he should be held liable for the consequences of reliance upon his misstatement.' " Id., 259.

*Bartholomew* and *Stamford* together make it clear that liability for innocent misrepresentation is not a novelty in this state, that such liability is based on principles of warranty, and that such warranty law is not confined to contracts for the sale of goods.

Extension of warranty liability for innocent misrepresentation to a builder-vendor who sells a new home is, as a matter of policy, consistent with the developing law of vendor and purchaser generally. In the not too distant past, it is true, *caveat emptor* dominated the law of real estate. See, e.g., *Levy v. C. Young Construction Co., Inc.,* 46 N.J. Super. 293, 134 A.2d 717 (1957), affirmed on other grounds, 26 N.J. 330, 139 A.2d 738 (1958). In this state, however, *caveat emptor* has not been allowed to stand in the way of imposition of liability for negligent misrepresentations. See *Warman v. Delaney,* 148 Conn. 469, 172 A.2d 188 (1961), and *Richard v. A. Waldman & Sons, Inc.,* 155 Conn. 343, 232 A.2d 307 (1967). Furthermore, *Scribner v. O'Brien, Inc.,* 169 Conn. 389, 363 A.2d 160 (1975), recognized the propriety of claims for negligence, express warranty, and, in dictum, implied warranty, and thus effectively and explicitly ended the role of *caveat emptor* in sales of new homes by builder-vendors.

On the facts of the case before us, as the trial court concluded, liability for innocent misrepresentation is entirely appropriate. Although the defendant vendor had built no houses other than this one, this information was not disclosed to the buyer until the sale had been concluded; the defendant had been otherwise engaged in the real estate business for about thirty years. Although indefinite, the defendant's statement that there was "nothing

wrong" with the house could reasonably have been heard by the plaintiff as an assertion that the defendant had sufficient factual information to justify his general opinion about the quality of the house. In context, this statement of opinion could reasonably have induced reliance. See Restatement (Second), Contracts §§ 310, 311 (Tentative Draft No. 11, 1976).

## II

The claims for negligence in construction depend upon a showing by the plaintiff that the defendant knew, or should have known, that the subsurface conditions of the building were substandard, and thus required special plans for the footings and the foundation of the house that he was building. The trial court found that the defendant had no actual knowledge of the soil defects, a finding which the plaintiff does not directly attack. The issue therefore is the defendant's constructive notice of the lot's instability despite its apparent content of standard bank run gravel. It is significant that the building inspector, who approved the construction plans, was found to have had no notice. At the time of this building project, test borings to determine soil suitability were not customary for residential construction. Although there was testimony which might have supported a different finding, the trial court was not bound to accept as persuasive even testimony that was not directly contradicted. *Yale University* v. *New Haven,* 169 Conn. 454, 463, 363 A.2d 1108 (1975); *Schwartz* v. *Town Planning & Zoning Commission,* 168 Conn. 285, 291, 362 A.2d 1378 (1975). Its conclusion of absence of notice is amply supported by other evidence and must therefore stand. Without notice, the claims for negli-

gence are unsustainable. *Coburn* v. *Lenox Homes, Inc.*, 173 Conn. 567, 378 A.2d 599 (1977); *Scribner* v. *O'Brien, Inc.*, 169 Conn. 389, 363 A.2d 160 (1975).

The plaintiff's effort in this court to sidestep the issue of notice by alleging violation of the Naugatuck Building Code is equally unavailing. The testimony of the building inspector did not categorically establish a violation; at best, as a matter of hindsight, the inspector indicated that, had he then known of the actual subsoil conditions, he would have refused a permit. In the court below, this testimony was offered and considered as part of the overall issue of notice, and there is no basis for this court, on this testimony, to refuse to accept the conclusions of the trial court.

## III

The assessment of damages in the trial court was an award in the amount of $5000 for breach of warranties and not for negligence. The plaintiff attacks this award as inadequate, since it does not measure damages by the cost of repairs. The defendant attacks the award as excessive because it does not measure the difference between the value of the property as warranted and as sold.

The plaintiff's claim for damages was twofold: $882.50 for sewer repairs occasioned by the settling of the foundation which damaged the sewer line, and $27,150 as an estimate, procured in 1971, for the cost of constructing a new foundation. The court specifically found that the cost of replacing the foundation would in all likelihood exceed the value of the house, originally purchased for $17,000.

Apart from the sewer repair costs, the plaintiff incurred, from 1965 to 1970, additional expenditures

of $5112 in connection with the house. These expenses were largely, but not exclusively, incurred in making repairs. The trial court concluded that, since a substantial part of the $5112 was for repairs attributable to the faulty settlement of the house, he would allocate to damages an amount which, when added to the $882.50 sewer costs, would produce a total recovery of $5000. The court noted that, in late 1971, when the plaintiff first complained to the defendant about problems with the house, the defendant offered to repurchase the property for the purchase price of $17,000 and the expense of repairs, then represented by the plaintiff to approximate $5000.

The general rule for measurement of damages upon breach of warranty is to award the prevailing party such compensation as will place him in the same position as he would have enjoyed had the property been as warranted. This is the general rule of contract law, and was discussed extensively, and applied to the sale of a new residential house, in *Levesque* v. *D & M Builders, Inc.*, 170 Conn. 177, 365 A.2d 1216 (1976). *Levesque* involved a buyer who wanted to relocate a house misplaced on a building lot. This court refused to permit relocation costs of $10,800 to be awarded for breach of contract and warranty, when the original contract price had been $22,600. Id., 182. *Levesque* adopts a rule that limits damages to the diminished value of the building whenever the cost of repairs is dramatically larger than is the difference in value. Id., 180–82. Although the costs of repair may more precisely place the injured party in the same physical position as full performance, policy dictates limitation to diminution of value to avoid unreasonable economic waste. It is clear that *Levesque* for-

bids recovery of the costs of a new foundation in the case before us, since the price discrepancy between reconstruction cost and contract price is even larger than it was in *Levesque*. Moreover, *Levesque* involved a defendant whose default could hardly be characterized as innocent. Contract restraints are particularly appropriate when damages are awarded, as in this case, for misrepresentations which, though actionable, are totally innocent. See Hill, "Damages for Innocent Misrepresentation," 73 Colum. L. Rev. 679 (1973), and Hill, "Breach of Contract as a Tort," 74 Colum. L. Rev. 40 (1974). The trial court was therefore correct in refusing to measure damages by the $27,150 estimated to be required to replace the foundation.

The proper test for damages was the difference in value between the property had it been as represented and the property as it actually was. This standard is notoriously more difficult to apply than to state. Reasonable costs of repair may therefore sometimes furnish a reasonable approximation of diminished value. *Richard* v. *A. Waldman & Sons, Inc.*, 155 Conn. 343, 348–49, 232 A.2d 307 (1967); *Levesque* v. *D & M Builders, Inc.*, 170 Conn. 177, 182, 365 A.2d 1216 (1976). Reliance expenses often serve as a surrogate for damages otherwise inaccessible to proof. See the classic articles, Fuller & Perdue, "The Reliance Interest in Contract Damages: 1," 46 Yale L.J. 52 (1936–1937), and Fuller & Perdue, "The Reliance Interest in Contract Damages: 2," 46 Yale L.J. 373 (1936–1937). The trial court's reference to the $5112 expended by the plaintiff with regard to the house would have been an acceptable resource for the inquiry into diminution of value, if only the $5112 list had accurately distinguished between expenses for repairs and

expenses for improvements. To the extent that reliance expenses are probative of losses incurred because of breach, they must be expenses demonstrably incident to breach. The tender of a particular sum by the defendant in negotiation of an aborted settlement is no more dispositive than is the plaintiff's unwillingness to agree to a rescission and to insist, as he had a right to do, on affirmative relief in damages.

Under these circumstances, the court's award of damages was in error, the judgment is set aside, and the case is remanded with direction to render judgment for the plaintiff to recover such damages as he may prove on a new trial limited to the issue of damages.

In this opinion the other judges concurred.