[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
Joseph Formato ("Formato" or "plaintiff") brought this action in three counts by complaint dated July 23, 1998. The first count alleged that Richard H. Girouard ("Girouard") was personally liable for breach of a co-brokerage agreement on the sale of a restaurant. The second count alleged that Victor Klein Associates ("Klein"), as Girouard's principal, was also liable for Formato's share of the commission. The third count alleged that Formato was a third party beneficiary of an agreement by which the defendant, Nutmeg Brewing and Restaurant Group, LLC d/b/a Southport Brewing Company ("Nutmeg"), agreed to pay Klein's commission as part of the purchase price for the restaurant. Nutmeg filed an answer dated September 17, 1998. Girouard and Klein filed an answer, special defense, and cross-claim dated October 16, 1998. Nutmeg filed an answer and special defense to the cross-claim dated October 28, 1998. Klein and Girouard replied to the special defense on November 2, 1998, and Formato replied to the special defense to the complaint on September 14, 1999, thereby closing the pleadings as to all parties. The matter proceeded to CT Page 13179 trial before this court on July 17, 2001. Post trial and specifically on August 6, 2001, the defendant Nutmeg filed a Request to File an Amended Special Defense to the Counterclaim alleging a second special defense. There was no objection to that pleading so it is accepted and the court will enter denials as to each paragraph of the second special defense.
In his complaint, the plaintiff alleged that defendant Klein was the listing broker of Sonoma Grille ("Sonoma"). Defendants Klein and Girouard admit this allegation. The listing agreement was for $500,000 and provided for a commission of ten percent (10%). The plaintiff further alleged that he brought William DaSilva, manager/president of defendant Nutmeg, to view the Sonoma premises and that William DaSilva (Nutmeg) became the eventual purchaser of the assets of the former Sonoma Grille. Defendant Nutmeg signed a binder for the proposed purchase and eventually entered into an asset purchase agreement. At trial there was no dispute as to the following essential facts: (1) Frank DiNardo was an agent of the plaintiff; (2) Klein was the exclusive listing agent for Sonoma, which was operating out of leased premises at 2600 Post Road, Fairfield, Connecticut, which restaurant was owned by Eurogrille Ltd. whose principal was David Mainero ("Mainero"); (3) Frank DiNardo produced William DaSilva who, as manager/president of Nutmeg, became the successful purchaser of Sonoma's assets; (4) defendant Nutmeg eventually agreed to pay a commission to Klein of forty thousand dollars ($40,000), payable in eighteen (18) monthly installments, to begin one month after opening by Nutmeg of its restaurant; (5) the restaurant began operating in April of 1997; and (6) no commission payments have been made.
The plaintiff's first witness was Frank DiNardo. Mr. DiNardo testified that in the spring of 1996 he was employed by the plaintiff as a real estate agent. He testified that he specialized in commercial real estate, including the buying and selling of businesses. He testified that during the spring of 1996 he placed a call to David DaSilva whom he knew was involved in the purchase and sale of fast food restaurants and asked him if he would be interested in the old Arthur Treacher's location in Southport. DaSilva told DiNardo he was not interested in that site, but that he was interested in something bigger, something more suitable for a sit-down restaurant. At that point, DiNardo informed DaSilva that he though he might have a location for him and then proceeded to tell him of the Sonoma Grille. After DaSilva expressed interest in that site, DiNardo contacted Klein and Girouard who were the listing agents for Sonoma. DiNardo testified that he arranged a meeting with the listing broker Girouard and they scheduled a walk through. At all times Girouard was an agent of Klein, was acting in that capacity and made this fact known to all parties. DiNardo testified that prior to producing the interested buyer (DaSilva/Nutmeg) he had reached an agreement with Klein's agent, Girouard, to split the broker commission on a fifty percent (50%) basis. CT Page 13180 DiNardo then had several meetings with DaSilva and Girouard as well as several phone calls to discuss the transaction. Defendant Nutmeg eventually purchased the property and agreed to pay a commission of forty thousand dollars ($40,000). The commissions were to be paid in eighteen monthly installments commencing in May of 1997, one month from the date the restaurant opened. Although no payments were ever made, the final payment would have been due and payable in October, 1998. Defendant Klein eventually made demand for payment, however, no legal action was ever instituted.
The next witness to testify was Richard Girouard. Girouard testified that in the spring of 1996 he was an agent of defendant Klein. He further testified that at that time he was the exclusive listing agent for Sonoma Grille. Girouard admitted that DiNardo did, in fact, produce the eventual purchaser of the Sonoma assets, but denied that he ever agreed to split the commission to be earned on a fifty percent (50%) basis. Girouard testified that he agreed to give a twenty percent (20%) referral fee to the plaintiff's agent, but that he did not enter into a co-broker agreement. Girouard claimed that although DiNardo produced a buyer, he did most of the work to make the deal happen.
The plaintiff then recalled DiNardo to the stand as a rebuttal witness. DiNardo testified that he had never taken a referral fee for a commercial transaction in his life. He testified that a referral fee is negotiated generally where the referring agent is not in the business of doing that kind of work. DiNardo testified that he was a commercial broker. He testified that commercial brokers do not refer to commercial brokers, rather they co-broker commissions. DiNardo detailed such an arrangement with Klein which had occurred shortly before the instant transaction. DiNardo also testified that the issue of fee splitting was discussed and agreed upon at the outset. In other words, you do not produce a potential buyer to a listing agent and work out details later. DiNardo also testified that as a commercial broker he has been involved in the sale of numerous restaurants. In fact, he testified that he obtained a purchaser for defendant Klein's listing of the Bombay Grille in Westport (for which he received a co-broke of 50% of the commission) and that shortly after the instant transaction, defendant Girouard solicited his help for a buyer for the Black Rock Oyster House.
During his cross-examination, DiNardo admitted that although he claimed he was to receive a fifty percent (50%) co-broker commission for producing a buyer for the Sonoma Grille, he was to get paid when defendant Klein got paid. In short, he had a pay when paid contract with the defendants.
Through Girouard's efforts, DaSilva eventually increased his initial CT Page 13181 offer to $500,000, as reflected in a written binder ("Binder") dated April 12, 1996. (Defendant's exhibit 2.) In order to minimize his cash outlay at the closing, DaSilva agreed to assume and pay the commission for which the seller was liable in eighteen monthly installments after the new restaurant commenced operations. DaSilva intended for his new restaurant to be a "brew pub", which would manufacture and sell on the premises its own beer. Accordingly, it was essential that the restaurant be able to accommodate customers at a bar equipped with bar stools: while the restaurant had bar stools, they were not authorized under applicable zoning regulations. After execution of the binder, Mainiero attempted to obtain approval of the existing bar stools but was unsuccessful twice.
On September 5, 1996, Nutmeg and Eurogrille executed a final Asset Purchase Agreement ("Contract"). (Plaintiff's exhibit A.) The purchase price was reduced by $100,000 to $400,000 in paragraph 2.1 because of the absence of bar stools. Paragraph 2.6, however, provided for an increase in the price back to $500,000 if Mainiero was able to obtain approval for the bar stools prior to the closing. He was not able to do so. Paragraph 2.2(c) of the contract provided for Nutmeg's payment of the Klein commission, reduced to $40,000 because of the reduction in the purchase price, payable in eighteen monthly installments commencing one month after Nutmeg opened for business. Paragraph 2.2(i) further provided for $25,000 of the purchase price to be held in escrow for six months after the closing in order to protect Nutmeg from certain "Seller's indemnity obligations" under the contract.
The closing was delayed because of various problems associated with Eurogrille's creditors, including taxing authorities. The parties eventually agreed that Nutmeg would pay the creditors directly out of closing proceeds. DaSilva visited the premises at least fifteen times prior to the closing, always accompanied by Girouard. The purpose of the visits was to inspect the restaurant and its contents, as well as to develop plans for conversion to a "brew pub" after the closing. On January 17, 1997, about two weeks before the closing, Girouard and DaSilva prepared an inventory ("inventor") (plaintiff's exhibit G) of the "small wares" for the restaurant. The last entries on page 3 indicate that quantities of certain items were "insufficient."
The closing occurred on January 31, 1997. Pursuant to the contract, an escrow agreement ("escrow agreement") (plaintiff's exhibit H) was executed and $25,000 was placed in escrow with the law firm of Trager 
Trager,[1] Mainiero's attorney. The financial aspect of the closing was set forth on a closing statement plaintiff's exhibit I) ("closing statement"). The closing statement reflected deductions from the sales price for the $40,000 deferred payment to Klein and the $25,000 escrow. In addition, there was a $2,700 credit for "missing small wares" and a CT Page 13182 $19,870.72 credit for a two month rent deferral which DaSilva had unsuccessfully attempted to extract from the landlord. (See paragraph 8.2 (a) (iii) of the contract.) DaSilva completed the renovations and the new restaurant, called "Southport Brewing Company", opened for business on April 15, 1997.
After the closing, DaSilva embarked on a campaign to recoup the $25,000 escrow fund. As reflected in letters dated July 28 and 29, 1997 (plaintiff's exhibit J), DaSilva claimed there were assorted missing small wares, missing equipment, leased equipment not disclosed, equipment not in working order, and leasehold items not up to standards. The grand total of all the claims was $35,490 as reflected in DaSilva's letter to his attorney dated July 28, 1997. As of July 28, 1997, DaSilva had accumulated actual bills (defendant's exhibits 1 through 31) totaling $37,292.21, on which he had based his July 28, 1997, letter. Mainiero rejected DaSilva's claims and caused Eurogrille to commence suit ("lawsuit") against Nutmeg in the Bridgeport Superior Court. Nutmeg filed a counterclaim ("counterclaim") in the lawsuit. (Plaintiff's exhibit L.) Paragraph 3 of the counterclaim incorporated the same claims as reflected in DaSilva's July 28, 1997 letter. In August, 1998, Eurogrille and Nutmeg settled the lawsuit and counterclaim. (Plaintiff's exhibits M and N.) The parties exchanged releases from the asset purchase agreement and the entire $25,000 escrow was paid over to Nutmeg's attorney. Girouard, on behalf of Klein, demanded payment of the commission from Eurogrille by letter dated June 5, 1997. (Plaintiff's exhibit C.) By letter dated August 17, 1998 (plaintiff's exhibit D), Eurogrille's attorney advised Girouard that the commission would not be paid.
At trial the plaintiff elected not to proceed against Nutmeg as long as Girouard/Klein agreed to proceed with its cross claim against Nutmeg which it did.
The issues then may be reasonably separated and become reasonably simple. The first count is against agent Richard Girouard individually for his alleged breach of his co-brokerage agreement with the plaintiff. In addition to denying that there was a co-brokerage agreement, Girouard has filed a special defense to the effect that he at all times was acting as an agent of Victor Klein and that the plaintiff cannot recover against him based on the disclosed principal rule. Under this well established rule, an agent is not liable where he contracts with a third party for a disclosed principal. Rich-Taubman Associates v. Comm. of RevenueService, 236 Conn. 613 (1996); Scribner v. O'Brien, Inc., 169 Conn. 389
(1975); Robert F. Reynolds Associates, Inc. v. Asbeck, 23 Conn. App. 247
(1990. Girouard clearly disclosed his principal at all times. The plaintiff has not even briefed this issue. Judgment shall therefore enter for the defendant Girouard as to the First Count. CT Page 13183
As to the second count, there are two issues. The first concerns the nature of the agreement between Dinardo as agent for the plaintiff and Girouard as agent for Klein. Their agreement was oral and never reduced to or confirmed by a writing. After considering all the evidence and the logical inferences to be drawn from it, the court concludes that the agreement was for a 50/50 co-broke split of the commission. Dinardo claimed that he was an experienced commercial broker, had been involved in many restaurant sales, had never taken one on a referral fee basis and in fact in a restaurant deal prior to this transaction and involving Klein he was paid a fifty percent (50%) commission for procuring a buyer.
The next question is when was that commission due. Dinardo clearly testified that he was due a commission only when Klein was paid which obviously has not happened. This is what is called a "paid when paid" agreement. The parties agreed that the first installment of eighteen was due one month after the restaurant opened and that would be May 15, 1997. The defendant Klein did not bring a lawsuit against Nutmeg to collect its commission before the plaintiff brought this lawsuit on July 23, 1998. It thereafter promptly brought its cross claim against Nutmeg to collect its commission. Pay when paid agreements do not excuse non payment or set conditions precedent, they merely set a time frame for payment which cannot exceed a reasonable period of time. Blakeslee ArpaiaChapman v. Diel Construction, Inc., 239 Conn. 708, 719 (1997). We are still within a reasonable time and the final result will have to await the determination of the issues on the cross claim between Klein and Nutmeg.
On the cross claim, Klein claims to be a third party beneficiary in the contract between Eurogrille and Nutmeg. The law is not in dispute. The concept of privity of contract as it relates to third party beneficiaries has come a long way since the seminal case of Treat v. Stanton,29 Conn. 374 (1841). The Connecticut Supreme Court restated the rights of third parties to sue immediate parties to a contract as follows:
 We have stated that a third party seeking to enforce a contract must allege and prove that the contracting parties intended that the promisor should assume a direct obligation to the third party. Byram Lumber Supply Co. v. Page, 109 Conn. 256, 259, 146 A. 293
(1929). See Knapp v. New Haven Road Construction Co., 150 Conn. 321, 325, 189 A.2d 386 (1963); Congress Daggett, Inc. v. Seamles Rubber Co., 145 Conn. 318, 324, 142 A.2d 137 (1958); Colonial Discount Co. v. Avon Motors, Inc., 137 Conn. 196, 200, 75 A.2d 507 (1950); CT Page 13184 Pavano v. Western National Ins. Co., 139 Conn. 645, 648, 96 A.2d 470 (1953). See also Baurer v. Devenis, 99 Conn. 203, 121 A. 566 (1923). . . .
 We reject the defendant's argument that as a matter of law a promisor cannot intend to assume a direct obligation to a third party unless the promisor's performance is to be rendered directly to that party. Contracts for the benefit of a third party are enforceable without any requirement that the promisor's performance be rendered directly to the intended beneficiary. Lucas v. Hamm, 56 Cal.2d 583, 590, 364 P.2d 685 (1961), cert. denied, 368 U.S. 987, 82 S.Ct. 603, 7 L.Ed.2d 525 (1962); Walker Bank Trust Co. v. First Security Corporation, 9 Utah 2d 215, 341 P.2d 944 (1959); Restatement (Second), Contracts § 133, Comment a; 2 Williston, Contracts (ed Ed.) § 356, p. 829 4 Corbin Contracts (1971 Sup.) § 777, pp. 14-15, n. 37.
Stowe v. Smith, 184 Conn. 194, 196-97 (1981). It is not necessary that the contract in question contain express language creating an obligation running directly to the putative third party beneficiary.
 "[T]he ultimate test to be applied [in determining whether a person has a right of action as a third party beneficiary] is whether the intent of the parties to the contract was that the promisor should assume a direct obligation to the third party [beneficiary] and . . . that intent is to be determined from the terms of the contract read in the light of the circumstances attending its making, including the motives and purposes of the parties." Colonial Discount Co. v. Avon Motors, Inc., 137 Conn. 196, 201, 75 A.2d 507; to the same effect are Pavano v. Western National Ins. Co., 139 Conn. 645, 648, 96 A.2d 470; Congress Daggett, Inc. v. Seamless Rubber Co., 145 Conn. 318, 324, 142 A.2d 137; see 4 Corbin, op. cit. § 777.
Knapp v. New Haven Road Construction Co., 150 Conn. 321, 325 (1963). The intent on the part of the contracting parties required to support a third party beneficiary claim was defined as follows:
 The intent which must exist on the part of the parties to the contract in order to permit the third party to CT Page 13185 sue was not a desire or purpose to confer a particular benefit upon him, but an intent that the promisor should assume a direct obligation to him.
Byram Lumber Supply Co. v. Page, 109 Conn. 256, 259-60 (1929) In order to ascertain the intent of the contracting parties, the court must, in turn, examine the language of the contract in issue:
 To determine the intent of the parties is a metter of interpretation of the contract. The intent of the parties expressed in a contract is not synonymous with the purposes or motives of those parties in making the contract. In ascertaining such intent, however, all of the circumstances surrounding the making of the contract must be taken into consideration; Byram Lumber Supply Co. v. Page, supra, 261; and the motives of the parties and the ends which they sought to accomplish by their contract are relevant.
The Listing Agreement directly obligated Eurogrille to pay Klein a ten percent (10%) commission upon the sale of the restaurant. The originally contemplated price of $500,000 having been reduced to $400,000 by mutual agreement, Eurogrille thus owed Klein $40,000 at the closing on January 31, 1997, payable immediately in a lump sum.
In order to facilitate the closing by minimizing Nutmeg's cash outlay, Klein agreed to defer collection of its commission in exchange for Nutmeg's agreement to pay the commission in installments after the closing. Section 2.2 of the contract provided in pertinent part as follows:
2.2 The Purchase Price shall be payable as follows:
 (c) Forty Thousand ($40,000.00) Dollars to be paid by the Buyer to the Broker on account of the Seller's obligations to the Selle's business broker, Victor Klein Associates, (the "Broker"), under the terms of a separate Lising Agreement between the Seller and the Broker, for the payment of a commission to the Broker in connection with the consummation of the transactions contemplated by this Agreement, said sum to be paid in eighteen (18) equal monthly installments of $2,222.22, without interest, commencing on the date which is one (1) month from the date Buyer opens for business at the premises and on the same day of each of the next seventeen (17) months thereafter. CT Page 13186
This agreement reflects the original undertaking by Nutmeg in the binder, with the amount of the commission and the monthly installments reduced in order to reflect the reduction in the purchase price. Nutmeg opened for business on April 15, 1997, more than eighteen months have elapsed since then, and Nutmeg has paid nothing to Klein. Apart from Nutmeg's special defense to the cross claim, therefore, Klein is clearly entitled to payment of $40,000 from Nutmeg.
In this case the contract specifically calls for a direct obligation running from Nutmeg to Klein. There is no need to discuss intent. All the benefits of deferring the commission benefitted Nutmeg not Klein. It lowered the cash due at closing, it provided no payments due until the business opened, it required no interest and it spread the payments over eighteen months. The court finds Klein was a third party beneficiary.
Nutmeg's two special defense to the cross claim have a common theme. In the first special defense Nutmeg claims that Eurogrille breached certain aspects of the agreement and therefore Nutmeg is relieved of the obligation to pay the balance of the purchase price. The second special defense expands upon the first by stating that as a result of claims by both Eurogrille and Nutmeg over claimed breaches of their agreement that Eurogrille sued Nutmeg, the parties settled their differences and signed mutual releases relieving each of them from any obligation under the agreement. Nutmeg argues the effect of this was to relieve it of any obligation to pay the balance of the purchase price under paragraph 2.2 (c) of the agreement. Obviously, Klein was not a party to this suit and in no way participated in its settlement.
The court does not agree with Nutmeg's position. To evaluate Nutmeg's position, let's assume a slightly different fact pattern. Let's assume again that in the agreement Nutmeg, as part of the purchase price, agreed to assume Eurogrille's obligation to pay the real estate commission and in fact paid it at the closing. Assume again that disputes subsequently arose between Nutmeg and Eurogrille concerning representations, warranties, and covenants it claimed were not complied with. Would anyone conclude that Nutmeg could sue and recover against Klein for the return of his commission as reparation for the sins of Eurogrille? I think not. Klein earned its commission and would never have to return its commission. Is there any reason for a different conclusion here where the commission is deferred? Again, I think not.
In the suit instituted by Eurogrille against Nutmeg, Nutmeg filed a counterclaim against Eurogrille. As part of the settlement of that case, Nutmeg got the entire $25,000 held in the escrow agreement along with other considerations. If it claims that Eurogrille owed it more money for CT Page 13187 its breaches, it should not have settled the case. It should have litigated all its claims against Eurogrille. Neither of these parties had any right to in any way compromise the rights of Klein to its commission, especially when Klein was not even a party to their disputes. The court finds no merit to the special defenses.
Obviously, the eighteen months has long since elapsed for the payment of the commission and therefore judgment will enter for Klein on the cross complaint in the amount of $40,000. The court in determining the question of interest finds that the commission was wrongfully withheld and grants interest at the rate of ten percent (10%) on the $40,000 judgment. The court will adopt the calculation of that interest as shown on pages 16 through 18 of Klein's brief with interest through August 15, 2001 of $14,152.50 and a per diem rate thereafter of $10.959.
In light of the court's earlier rulings, any payment on this judgment and interest shall be evenly divided between Joseph Formato and Victor Klein Associates.
GORMLEY, J.