[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
REPORT OF ATTORNEY TRIAL REFEREE
The undersigned attorney trial referee hereby reports his findings regarding the facts and conclusions drawn therefrom in the above-entitled action:
I. FACTS:
1. In 1963 George Johnson and Marion Johnson purchased property on Main Street in the Town of Bozrah. The property consisted of a building in which a grocery business was located, and land surrounding the building.
2. At the time the Johnsons purchased the property, and throughout their ownership of it, the sewerage facilities consisted of a cesspool located underneath the parking area.
3. In November of 1984, George and Marion Johnson sold the grocery business to Walter A. Goula and Lori A. Goula, taking back a promissory note for a portion of the purchase price, and also leased the real property to Mr. and Mrs. Goula by instrument dated November 30, 1984. Mr. and Mrs. Goula were to continue to use and occupy the premises as a grocery store during the term of the lease, which was five years. The lease required that the Goulas maintain the plumbing and sewerage facilities in good order, condition and repair.
4. The lease provided that the Goulas would have an option to purchase the property for $55,000.00 at any time during the term of the lease.
5. During the time that the Johnsons used the premises as a grocery store, from 1963 to November of 1984, they never had the cesspool pumped out and never experienced problems with
6. Shortly after purchasing the business the Goulas noticed that liquid from the cesspool was bubbling onto the surface of the ground.
7. When the Goulas purchased the business it was a "mom and pop" Universal Food Store. In an effort to promote business, they began featuring and emphasizing "take out" items, the preparation of which caused them to hire more employees, use water for washing food and washing hands, and cleaning the store and the food preparation area. CT Page 1996
8. When the cesspool liquid began bubbling to the surface, Mr. Goula called Abrahamson, who pumped out the cesspool in July of 1985.
9. Mr. Ted Viadella, a customer of the store who was in the business of installing septic systems, approached Mr. Goula and mentioned that he saw the cesspool being pumped and that Mr. Goula should consider replacing the cesspool. Mr. Viadella described how a septic system differs from a cesspool. Mr. Goula asked how much a septic system would cost, and Mr. Viadella answered that it would vary depending on whether a new tank was required.
10. Mr. Johnson was told by Mr. Goula that the cesspool had overflowed, and talked with Mr. Viadella after Mr. Viadella had spoken to Mr. Goula, and recalls Mr. Viadella telling him that the cesspool was on its last legs and should be replaced because it was getting "saturated". He recalls that this was during a casual conversation when he saw Mr. Viadella at the store, and considered that Mr. Viadella was looking for business. In addition, he regarded any difficulty with the cesspool as the Goulas' responsibility under the lease, and it was his understanding that Mr. Viadella had already spoken to Mr. Goula.
11. In the fall of 1985 the Goulas received permission from the Johnsons to list the property for sale. Their objective was to locate a buyer who would purchase the property for a sum greater than the option price that they were required to pay to the Johnsons.
12. The Johnsons and the Goulas understood that the Goulas were to deal with potential purchasers, employ realtors and negotiate items and conditions without having to refer decisions to the Johnsons. The Johnsons would regard themselves as being satisfied so long as they would receive the $55,000.00 option price and any arrearages due to them on the lease and on the promissory note.
13. When a buyer was not located, the Goulas withdrew the property from the market.
14. In September of 1986, the cesspool overflowed and Abrahamson was called by Mr. Goula to pump it. Mr. Goula recalls being told by Mr. Abrahamson at that time that the cesspool was "old" and that the only way to maintain it was to pump it out. There was no discussion as to the frequency of pumping. CT Page 1997
15. Mr. Viadella was a frequent customer of the store during the time that it was operated by the Goulas, and had discussions with Mr. Goula about a variety of topics. Mr. Viadella had a second conversation with Mr. Goula on the subject of a new septic system, and once sketched on a napkin or piece of paper how a septic system looked and worked. He told Mr. Goula that it was his opinion that if liquid overflows to the surface from a cesspool, it is an indication that the cesspool has "failed".
16. The Goulas did not solicit Mr. Viadella's opinion of the condition of the cesspool. Mr. Viadella made no inspection or test or other investigation of the cesspool during the time that the property was occupied by the Goulas.
17. In the fall of 1987, with the consent and authorization of the Johnsons, the Goulas again listed the business and real property for sale through the Boyer Agency. As before, the Johnsons understood that the Goulas would deal with prospective purchasers, employ realtors and negotiate terms and conditions without having to refer decisions to the Johnsons. The Goulas also understood that they would be the ones who would deal with prospective purchasers and provide details regarding the operation of the business and the condition of the land.
18. By the fall of 1987, the Goulas were significantly in arrears on their lease payments and promissory note payments to the Johnsons.
19. In October of 1987 the Goulas entered into an agreement with Robert Langlois and Denise Langlois for the purchase of the business and real estate.
20. Mr. and Mrs. Langlois did not inquire about the sewerage system before the execution of the October, 1987 agreement, and there was no discussion of the sewerage system prior to the execution of the contract.
21. After the agreement was executed in October of 1987, Mr. and Mrs. Langlois began spending time at the store in order to familiarize themselves with the operation of the business.
22. on April 14, 1988 the cesspool overflowed and was pumped out by Abrahamson.
23. By an agreement with a typewritten date of April 21, 1988, a handwritten date of April 28, 1988 opposite the buyers' signatures and an "acceptance date" of May 18, 1988 underneath the sellers' signatures the parties entered into another CT Page 1998 agreement for the purchase and sale of the business and real estate. This agreement had the same financial terms as the October, 1987 agreement. The reason for its execution was that the Langlois' were going to get a loan to finance the purchase, and the banking institution needed an updated agreement in lieu of the October, 1987 agreement which had expired by passage of time.
24. The purchase price set forth in the agreement was $165,000.00. There was no allocation of that price among the real property, inventory, business assets, etc. The statement of sale prepared in connection with the closing does not contain any allocation between the real estate and business.
25. After the October, 1987 agreement was executed and before the April, 1988 agreement was executed, there were discussions about the sewerage system between Mr. Goula and Mr. Langlois, who was on and about the premises learning the details of the business. Mr. Goula told Mr. Langlois that the system would operate properly with "routine maintenance", showed him where the cesspool cover was located in the parking lot, and said that when it bubbled over it was a "trigger" to pump it.
26. Mr. Goula's understanding of "routine maintenance" was that the system should be pumped out when it bubbled over, and that such pumpings averaged once a year, and that the only method of knowing that the cesspool needed pumping was when it bubbled over.
27. At the time Mr. Goula made his statement to Mr. Langlois the cesspool had overflowed three times in the span of almost four years that the Goulas were operating the store, since November of 1984. (Overflows on July 19, 1985, September 5, 1986 and April 14, 1988).
28. Mr. Langlois agreed that he asked Mr. Goula about the condition of the cesspool at or about the time of entering into the April, 1988 agreement. He recalls that Mr. Goula told him it was in fine condition and that he pumped it out approximately once a year.
29. The April, 1988 buy and sell agreement contains the following clause: "INSPECTION AND GUARANTEE: Buyer agrees that he relies on his own inspection of the premises with respect to the physical condition thereof, and that no representation, warranty or promise, expressed or implied, not herein set forth has been made by Seller or any representative of Seller".
30. Mr. Goula did not specifically mention the April 14, 1988 overflow to Mr. Langlois and assumed that Mr. and Mrs. CT Page 1999 Langlois were aware of it because of their frequent visits to the store during that time, but did not recall with certainty that either Mr. Langlois or Mrs. Langlois were present when the overflow or pumping occurred.
31. Mr. and Mrs. Johnson did not know the identity of the purchasers of the land and business until May of 1988, when Mr. Johnson received a telephone call from Mr. Langlois.
32. Mr. Johnson and Mr. Langlois agree that the main topic of discussion was the boundary line. Mr. Johnson does not recall that the sewerage system was discussed.
33. The June 10, 1988 closing was the "SBA loan closing". The actual change of possession occurred on June 30, 1988, when the SBA funds had been made available and a second "sale" closing took place.
34. Between the "SBA" closing on June 10, 1988 and the "sale" closing on June 30, 1988 Mrs. Langlois spent considerable time at the store learning the details of the operation, and Mr. Langlois visited the store 4 or 5 times after work.
35. On June 24, 1988 the cesspool overflowed and Abrahamson pumped it. Mr. Goula testified that he was engaged in heavy cleaning prior to the turnover, that his wife was pregnant and used the bathroom frequently, that the toilet handle was defective and that there was a high volume of business. These factors led him to conclude that the overflow was not unusual.
36. Mr. Goula recalls that Mrs. Langlois was working at the store on the day the cesspool overflowed in June, 1988, and would have had to drive over the overflowed area in the parking lot.
37. Mr. Goula did not mention or discuss either the April 14, 1988 overflow or the June 24, 1988 overflow with Mr. or Mrs. Langlois, and did not mention that he had it pumped on those occasions.
38. Mr. and Mrs. Goula were in default of their lease and promissory note obligations to Mr. and Mrs. Johnson since about April of 1987. Mr. Goula testified that they would have borrowed the funds to repair the sewerage system had they considered it necessary, and that their decision to sell was not motivated by problems with the sewerage system, but rather by the fact that Mrs. Goula was pregnant and would have to spend a good deal of time with the newborn baby, and that the long hours involved in running the business were wearing them down. CT Page 2000
39. Although the statement of sale recites that the conveyance of the land and business was from Mr. and Mrs. Goula to Mr. and Mrs. Langlois, the deed to the real estate ran directly from Mr. and Mrs. Johnson to Mr. and Mrs. Langlois. The Johnsons received the option price from the proceeds of the closing, and also the arrearages on the note and lease. The balance of the closing proceeds, after commissions and closing expenses, was paid to the Goulas.
40. Mr. Goula negotiated with Mr. and Mrs. Langlois with the knowledge and consent and "input" of his wife Lori.
41. About 3 days after Mr. and Mrs. Langlois took over the store on June 30, 1988, the cesspool bubbled over onto the ground. The system was pumped by Abrahamson. Three or four days later the cesspool again started to bubble over.
42. Having experienced two cesspool overflows in one week, Mr. Langlois spoke with Mr. Viadella, who estimated that it would cost $5,400 to $5,500 to replace the cesspool with a septic system.
43. Mr. Langlois regarded the repair of the sewerage system as an emergency, and did not seek other estimates.
44. Mr. Viadella replaced the cesspool with a septic system in August of 1988. He charged $5,340.00. which was paid by Mr. and Mrs. Langlois. Fitzgerald Plumbing charged $196.00 to hook up the plumbing to the septic system, which was also paid by Mr. and Mrs. Langlois.
45. Mr. Viadella testified that a cesspool cannot be repaired, and that it must be replaced by a septic system.
46. Mr. Viadella testified that it is not "normal" for a cesspool to overflow, and when it bubbles over it is a sign that the cesspool has failed.
47. Mr. Viadella testified that pumping helps "maintain" a cesspool, but once it bubbles over he considers that it has failed and cannot repair itself and simply refills with waste.
48. Mr. Viadella testified that he told Mr. Goula that if there was a cesspool which was under the parking lot surface it had failed.
49. Mr. Viadella did not investigate or test the sewerage system while the Goulas operated the store, and did not tell the Goulas that the sewerage system was in fact a cesspool. CT Page 2001
50. Mr. Viadella told Mr. Goula that if a cesspool bubbles over it has "failed", but there was no testimony that he told Mr. Goula that the effect of a "failure" was that it could not be pumped or maintained.
51. Mr. Viadella was a frequent, almost daily customer of the store, and had many general conversations with Mr. Goula. The conversations about cesspools and septic systems were part of those general conversations.
II. CONCLUSIONS:
1. The plaintiffs allege that the defendants George Johnson and Marion Johnson are liable to the plaintiffs because of misrepresentations and nondisclosures by the Johnsons regarding the sewerage system on the store premises. There was no evidence that Marion Johnson had any conversations with the plaintiffs. George Johnson became aware of the existence of the plaintiffs a short time before the closing of the sale of the store premises. He and Mr. Langlois clearly recall a telephone conversation shortly before the closing the subject of which was a boundary line. Mr. Johnson had no recollection that the sewerage system was discussed. Mr. Langlois' recollection as to whether the sewerage system was discussed was not as certain as his recollection that the boundary line was discussed. Statements attributed to Mr. Johnson regarding the sewerage system were similar to statements he also attributed to Mr. Goula. The undersigned does not find that Mr. Langlois asked Mr. Johnson about the sewerage system, or that Mr. Johnson made statements or representations to Mr. Langlois regarding the system.
2. The plaintiffs allege that the defendants George Johnson and Marion Johnson are liable to the plaintiffs because of misrepresentations and nondisclosures regarding the sewerage system made by their agents, Walter Goula and Lori Goula. Both Mr. Johnson and Mr. Goula testified that Mr. Goula requested the Johnsons to authorize the lifting of the real property for sale by the Goulas, and the Johnsons agreed that the Goulas would deal with prospective purchasers. That the Johnson would regard themselves as satisfied by payment of the $55,000.00 option price and arrearages on the promissory note and lease does not alter the fact that the Johnsons authorized the Goulas to act on their behalf in the marketing and sale of their real property. "An essential ingredient of agency is that the agent is doing something at the behest and for the benefit of the principal." Leary v. Johnson, 159 Conn. 101, 105-6 (1970). Although the Johnsons could have controlled the activities of the Goulas with respect to the marketing of the real estate, they chose not to CT Page 2002 do so and placed no limits on the Goulas in their dealings with others, requiring only that the consideration be sufficient to pay the option price and the accumulated arrearages. The elements of an agency relationship include (1) a manifestation by the principal that the agent will act for them; (2) an acceptance by the agent of the undertaking and (3) the principal's control of the undertaking. Beckenstein v. Potter Carrier. Inc., 191 Conn. 120, 132-3 (1983); Restatement (Second), 1 Agency Sec. 1. The Johnsons consented to the Goulas acting for them, the Goulas accepted that undertaking and the Johnsons could have controlled the undertaking by issuing appropriate instructions to the Goulas. In addition, the Johnsons retained control, as the closing could not have occurred without their agreement and ratification of the deal and their execution of a deed. In their dealings with the plaintiffs the Goulas acted as agents of the Johnsons.
3. The plaintiffs claim that the defendants, through statements of the the defendant Walter Goula, fraudulently and intentionally represented that the sewage system was in good working order. To prevail, the plaintiffs must establish: (1) that Mr. Goula made a false representation as a statement of fact: (2) it was untrue and known to be untrue by Mr. Goula; (3) it was made to induce the plaintiffs to act upon it; (4) the plaintiffs did so act to their capacity. Miller v. Appleby,183 Conn. 51, 55 (1981).
4. The plaintiffs also claim that there was a fraudulent nondisclosure of facts known to Mr. Goula regarding the adequacy of the sewage system which were not revealed upon inquiry by Mr. Langlois. Once a vendor assumes to speak, he must make a full and fair disclosure as to the matters about which he assumes to speak. Franchey v. Hannes, 152 Conn. 372, 379 (1965); Bernard v. Gershman, 18 Conn. App. 652, 656 (1989). To constitute fraud by nondisclosure or suppression there must be a failure to disclose known facts and a request or an occasion or a circumstance which imposes a duty to speak. Duska v. Middletown, 173 Conn. 124, 127 (1973); Wedig v. Binster [Brinster],1 Conn. App. 123, 130 (1983).
5. The proper standard for establishing fraud is by clear and convincing evidence, which means that the facts asserted are highly probably true, or that the probability of their truth is substantially greater than the probability of their falsity. Clark v. Drska, 1 Conn. App. 481, 487 (1983). It is an "enhanced civil standard". DeSantis v. Piccadilly Land Corporation, 3 Conn. App. 310 (1985), and is greater than proof by a fair preponderance of the evidence. Kavarco v. T.J.E., Inc., 2 Conn. App. 294, 226 (1984). CT Page 2003
6. Before the April, 1988 agreement was executed, Mr. Langlois asked Mr. Goula about the sewage system. Mr. Goula showed him where the cesspool cover was located in the parking lot and told him that the system would operate properly with "routine maintenance", that he pumped it out once a year, and that the signal, or "trigger", that the system needed pumping was when it bubbled over. The plaintiffs assert that these statements were false because Mr. Goula had been told by Ted Viadella that when a cesspool bubbles over it is an indication that it has failed. The defendants assert that these statements were an accurate reflection of Mr. Goula's knowledge and understanding of the operation of the system and his experience with it.
7. At the time Mr. Goula made his statement to Mr. Langlois the cesspool had overflowed three times in the span of almost four years that he had been operating the store since November of 1984. There was one overflow in 1985, one overflow in 1986 and one overflow in 1988. There were no overflows in 1987. The statement that he had it pumped once a year was not false.
8. Mr. Goula was told by Mr. Abrahamson, the septic waste pumper, that the cesspool was old and that the only way to maintain it was to pump it out. Mr. Ted Viadella, who engaged in the business of installing septic tanks, was a regular and frequent customer of the store who would often engage Mr. Goula in casual conversations. On one occasion during those casual conversations, Mr. Viadella told Mr. Goula that if it was a cesspool which was under the parking lot, bubbling over indicates that it had failed, and on another occasion he described to Mr. Goula the difference between a cesspool and a septic system, but could not give a price for a septic system because he did not know whether there was a tank under the ground or if the tank had to be replaced. Mr. Goula never solicited Mr. Viadella's opinion, and there is no evidence that Mr. Viadella ever tested or investigated the system for Mr. Goula. Mr. Goula regarded Mr. Viadella's unsolicited comments as made during casual conversation and an attempt to generate business. Having already been told by Mr. Abrahamson that the way to maintain the system was to pump it out and having experienced only three instances of pumping in almost four years, his statement that the system needed routine maintenance was not untrue and known to be untrue by Mr. Goula.
9. Mr. Viadella testified during the trial that pumping helps to maintain a cesspool but pumping cannot be used as a method of repairing a cesspool once it has overflowed, but there is no evidence that he communicated this thought to Mr. Goula during their conversations. CT Page 2004
10. The plaintiffs claim that Mr. Goula's failure to mention the overflows and pumpings was a fraudulent nondisclosure of facts regarding the adequacy of the sewage system. However, Mr. Goula mentioned during his reply to Mr. Langlois' question that the routine maintenance consisted of pumping the system about once a year, and the "trigger" or signal that pumping was necessary was when the system bubbled over.
11. Mr. Langlois recalls that Mr. Goula told him that the sewage system was in fine condition, but he did not dispute that Mr. Goula also told that maintenance was required which consisted of pumpings occurring after the system overflowed about once a year. This was not a situation including silence in the face of a question, or a generic answer that the system was "OK". Mr. Langlois was told that the system had bubbled over about once a year and that this was the signal that the system needed pumping.
12. In view of the foregoing, and considering that the proper standard of proof for establishing fraud is the "enhanced civil standard" of clear and convincing evidence, the undersigned does not conclude that the defendants made fraudulent and intentional misrepresentations regarding the adequacy of the sewage system, and does not find that there was a fraudulent nondisclosure of facts regarding the adequacy of the sewage system.
13. The plaintiffs also claim that they are entitled to damages as a result of "legal fraud". Under this theory, an innocent or mistaken representation would allow the plaintiffs to recover. Strickland v. Vescovi, 3 Conn. App. 10, 14 (1984); Johnson v. Healy, 176 Conn. 97, 101-2 (1978). "One who, in a sale. . . makes a representation of material fact for the purpose of inducing the other to act or refrain from acting in reliance upon it, is subject to liability to the other for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation, even though it is not made fraudulently or negligently." Restatement, Second, Torts, Sec. 552C.
14. In contrast to the standard of proof for fraud, the less exacting standard of a fair preponderance of the evidence is applicable. Strickland v. Vescovi, 12 CLT No. 11 (March 17, 1986), p. 21.
15. The statement by Mr. Goula that the sewage system was in good order and needed maintenance in the form of pumping when it overflowed was a misrepresentation, although not made fraudulently or negligently. The system overflowed twice starting after the sale to the plaintiffs, and could not be CT Page 2005 resuscitated by pumping.
16. Mr. Goula's statement was made for the purpose of inducing the plaintiffs to purchase the property; the plaintiffs relied on the statement and were justful in relying upon it.
17. Taking into consideration the standard of proof of a fair perponderance of the evidence, the undersigned concludes that the defendants are liable to the plaintiffs on the theory of innocent misrepresentation. "It would be unjust to permit the defendants under these circumstances to `retain the fruits of a bargain induced by' a material misrepresentation upon which the plaintiffs relied". Richard v. A. Waldmann Sons. Inc.,155 Conn. 343, 347 (1967), citing E F Construction Co. v. Stamford, 114 Conn. 250, 258 (1932).
18. The damages for innocent misrepresentations are limited to the extent necessary to compensate the plaintiffs for the fact that they were induced to part with something more valuable than that which they have received. Strickland v. Vescovi, 12 CLT No. 11 (March 17, 1986), p. 21, "The proper test for damages is the difference in value between the property as represented and the property as it actually was. This standard is notoriously more difficult to apply than to state. Reasonable costs of repair may therefore sometimes furnish a reasonable approximation of diminished value". Johnson v. Healy, 176 Conn. 97, 106 (1978), citing Richard v. A. Waldman 
Sons. Inc., 155 Conn. 343, 348, 9 (1967). The undersigned concludes that the cost of repair of the septic system was $5,536.00.
19. The plaintiffs allege that the defendants violated the Connecticut Unfair Trade Practices Act (CUTPA), Conn. Gen. Stat. Sec. 42-110b. To prevail, the plaintiffs must prove that the defendants engaged in a practice which was unfair, immoral, unethical, oppressive, unscrupulous, or causes substantial injury to consumers, competitors or other businessmen. Web Press Services Corporation v. New London Motors, Inc., 203 Conn. 342,355 (1987). In the instant matter, while the plaintiffs have proven that the defendants made an innocent misrepresentation, there has been no proof of purposeful deceit or an unscrupulous plan. Mr. Goula was erroneously considered that the sewage system was capable of being maintained by pumping, but his actual experience with the system and Mr. Abrhamson's statement that the method of maintaining the system was to pump it out was a reasonable basis for his position. A mistake or erroneous conclusion is not necessarily equivalent to an immoral or unethical practice. The plaintiffs are not entitled to damages on the CUTPA count. CT Page 2006
20. The plaintiffs also claim punitive damages. "In order to award punitive or exemplary damages, evidence must reveal a reckless indifference to the rights of others or an intentional or wanton violation of those rights. In fact, the flavor or the basic requirement to justify an award of punitive damages is described in terms of wanton and malicious injury, evil motive and violence." Gargano v. Heyman, 203 Conn. 616,622 (1987) (citations omitted). Again, while Mr. Goula mistakenly and erroneously considered that the sewage system was capable of maintenance by pumping, he was not reckless or wanton in reaching that conclusion. He disclosed to the plaintiffs that the system needed pumping. He did not engage in malicious activity based on evil motivations. The plaintiffs are not entitled to punitive damages.
21. The damages for innocent misrepresentations are limited to the amount necessary to compensate the plaintiffs for the difference in value between the property as represented and the property as it actually was. The defendants are not liable to the plaintiffs for fraudulent misrepresentation or fraudulent nondisclosure, the plaintiffs are not entitled to damages on the theories of CUTPA violations or punitive damages. The plaintiffs, therefore, are not entitled to attorney's fees.
22. It is recommended that judgment enter as follows:
First Count: Judgment for the plaintiff in the amount of $5,536.00, plus costs.
Second Count: Judgment for the defendants
Third Count: Judgment for the defendants
Fourth Count: Judgment for the defendants.
Respectfully submitted EDWARD B. O'CONNELL Attorney Trial Referee