**Richard DANISE, Plaintiff,**

v.

**SAFETY–KLEEN CORP., Defendant.**

**No. CIV.A. 395CV2406 (JBA).**

United States District Court,
D. Connecticut.

July 20, 1998.

88

Barbara M. Dratch, Philip F. Spillane, Moots, Pellegrini, Spillane & Mannion, New Milford, CT, for plaintiff.

Mark B. Seiger, Donald E. Frechette, Janet Marie Helmke, Edwards & Angell, Hartford, CT, for defendant.

## MEMORANDUM OF DECISION

ARTERTON, District Judge.

Plaintiff's Second Amended Complaint alleges defendant's violation of Conn. Gen.Stat. § 52–572m, et seq., Connecticut's Products Liability law, in connection with the functioning of its automotive parts cleaning machine that was involved in a fire on October 14, 1994 in which plaintiff was seriously injured. After consideration of all the testimony and evidence presented by the parties in the course of this eleven-day bench trial, the Court concludes that the plaintiff has not proven by a preponderance of the evidence that defendant is liable under Conn. Gen. Stat § 52–572m, et seq.

### Factual Findings

On October 14, 1994, the defendant, Safety–Kleen Corp., was, and still is, a corporation authorized to do business in the State of Connecticut engaged in the distribution, leasing and servicing of automotive parts cleaning machines and solvents used therein, including the Safety–Kleen Parts Cleaner serial number 141–56035, containing Safety–Kleen 105 Solvent at issue in this case, which it designed, manufactured and marketed.

The defendant placed the subject Safety–Kleen parts washer and solvent into the stream of commerce on November 19, 1992, which reached The Brake Shop, where plaintiff became employed, in substantially the same condition in which it was sold. The defendant warranted that the Safety–Kleen parts washer and solvent were safe for reasonably foreseeable uses.

James Beauvais, through his corporation, JMJB Corp., was the franchisee owner of The Brake Shop, an automotive repair shop located on White Street, Danbury, Connecticut with three employees in addition to Mr. Beauvais. Dennis Carr was the assistant manager, Joseph Williams was the lead mechanic and Armin Kapahnke was the other mechanic. At some time prior to August 1994, Joseph Williams, left The Brake Shop to take another job. Mr. Beauvais promoted Armin Kapahnke to lead mechanic, and hired the plaintiff, Richard Danise in August 1994.

On March 24, 1994, Mr. Beauvais entered into a lease agreement with the defendant, Safety–Kleen Corp., for the use and servicing of a Safety–Kleen Model 60 parts cleaner ("the parts cleaner"). The Safety–Kleen parts cleaner is a machine designed and manufactured for use in the automotive repair industry to clean automotive parts and remove grease, grime and dirt. The parts cleaner utilizes a solvent known as Safety–Kleen Solvent 105 ("the solvent"). Safety–Kleen 105 parts cleaner solvent was provided to The Brake Shop for use in the parts washer at the time the parts washer was delivered to The Brake Shop.

At the time the lease agreement was signed and the parts cleaner was delivered to The Brake Shop, the defendant's sales and service representative, Darryl Jones (who did not testify at trial), represented to Mr. Beauvais that the parts cleaner he was leasing utilized a non-flammable, "aqueous" solvent. The defendant did not provide a Material Safety Data Sheet ("MSDS") to The Brake Shop at the time the parts cleaner and solvent were delivered or thereafter, until the MSDS was specifically requested at the time of the fire that injured Mr. Danise. The defendant further failed to provide an instruction manual or any written instructions regarding the safe use of the parts cleaner and solvent to The Brake Shop at the time the parts cleaner and solvent were delivered to The Brake Shop, or thereafter. The defendant did not provide any verbal instructions or warnings concerning the safe use of the parts cleaner at the time the parts washer was delivered to The Brake Shop or thereafter.

The lease agreement provided for servicing and maintenance of the parts cleaner by the defendant at 12–week intervals. On August 25, 1994, the defendant serviced the parts cleaner. Despite the 12–week service term contained in the lease agreement, this was the only time the defendant serviced the parts cleaner from the date of delivery to the date of the fire and plaintiff's injuries. Moreover, this service call consisted only of a changing of the solution tank, but no further effort to clean or otherwise service the machine.

The parts cleaner utilized an electric motor to power a pump that pumped solvent from a reservoir up and into a basin equipped for cleaning parts. The electric motor powered an impeller that spun and drew solvent into a hose. The solvent was dispensed through a brush of nylon bristles designed to clean auto parts as solvent came out of the brush into the basin area.

On October 14, 1994, the plaintiff returned from lunch at approximately 2:00 p.m. He first washed his hands in the sink located along the rear wall of the shop. At that time, the plaintiff stood facing the right rear wheel of the vehicle he was working on, which had been raised on the lift. The parts cleaner was located along the right-hand wall of the shop, directly opposite the right rear wheel of the car, so that the plaintiff stood with his back to the parts cleaner as he examined the vehicle. Mr. Kapahnke had used the parts cleaner prior to lunch and had left it running.

From this location, as Mr. Danise turned to his right, he heard a sound that he described as an "eruption" and saw flames shooting out from the parts cleaner directly at him. He raised his arms to protect his face, however, the flames caused his clothes to catch on fire and he then ran out of the building in flames.

Mr. Kapahnke did not see the explosion, but heard a "whoosh" sound and felt heat on his back, whereupon he dropped to the floor. When he got up, he saw the parts washer in flames, but could not see the plaintiff. Mr. Kapahnke moved around the car to the front of the shop and saw Mr. Danise in flames in

the parking lot, realized that he could not help him without the fire extinguisher, went back into the shop, got the fire extinguisher and extinguished the fire on Mr. Danise.

After putting out the fire on Mr. Danise, Mr. Kapahnke then returned to the parts cleaner to put the fire out there. Mr. Liam Gorman, a mechanic from an adjacent automotive shop, Motorworks, came into the Brake Shop and assisted Mr. Kapahnke in putting out the fire in the parts cleaner. Mr. Kapahnke described the fire at the time he put it out as a steady flame, reaching several feet into the air, and he testified that there were no additional explosions after the initial whoosh that he heard.

Mr. Kapahnke estimates the duration of time between first hearing the "whoosh" and feeling heat on his back and the extinguishing of the fire in the parts cleaner to have been approximately one minute. Although Mr. Beauvais did not witness either the start or conclusion of the fire, he did call 911 for emergency assistance. After the ambulance arrived and the emergency medical technicians began to treat the plaintiff, one of the EMT's asked Mr. Beauvais for the Material Safety Data Sheet applicable to the solvent, so that he could determine the nature of the substance involved with the fire. When Mr. Beauvais explained that he never received a Material Safety Data Sheet from the defendant, the EMT instructed Mr. Beauvais to call a Safety–Kleen office and have one faxed. Mr. Beauvais did so, and a material Safety Data Sheet arrived by fax a few minutes later.

As a result of the fire, Mr. Danise sustained severe burns to his face, head, neck, chest, both arms, both hands and right leg. Shortly after Mr. Danise was taken by ambulance from the scene, an investigation was conducted by Fire Marshal Alan Schacht and Deputy Fire Marshal Robert Whitlock of the Danbury Fire Department.

After the Fire Marshal and Deputy Fire Marshal had left the scene, two representatives of Safety–Kleen arrived at The Brake Shop. The Safety–Kleen representatives inspected the parts washer, and at the conclusion of their inspection, took possession of the parts washer and transported it to a Safety–Kleen facility.

**Expert Testimony**

In March 1997, the plaintiff's expert witness, Harold I. Zeliger, Ph.D., inspected the parts washer at the law offices of Halloran & Sage in Hartford. Dr. Zeliger took a sample of the solvent and submitted it to a laboratory for chemical analysis. During his inspection, Dr. Zeliger determined that a fire cause and origin expert with expertise in electrical fires was needed in order to evaluate fully the cause and origin of the fire. He referred the plaintiff's counsel to Fred Paul III, a forensic engineer with the firm of George Slack & Pritzker, Inc.

On July 10, 1995, Dr. Zeliger, Mr. Paul and Paul Pritzker, of George Slack & Pritzker, Inc., inspected the parts washer at the office of Halloran & Sage. Mr. Paul took numerous photographs to document his inspections. Following the two inspections, Dr. Zeliger's chemical analysis of the solvent, and his review of the deposition testimony, the MSDS and the Safety–Kleen product literature, Dr. Zeliger arrived at certain conclusions regarding the adequacy of the warnings given to Mr. Danise about the dangers of the parts cleaner, and the nature of the fire. Among other things, Dr. Zeliger testified that to the extent that warning labels were affixed to the parts washer, those warnings were inadequate to convey to the user accurate information concerning the hazards associated with the solvent, but adequate to contraindicate smoking within two feet of the machine. The warning labels failed to warn that the solvent vapors were heavier than air and could travel great distances to ignition sources and flash back, and that the vapors from the solvent could be ignited by static discharge. The labels provided an inaccurate and misleading warning concerning the hazards of smoking in the vicinity of the parts washer by only warning the user not to smoke within ten feet of the parts cleaner. Dr. Zeliger testified that this particular warning is inconsistent with information contained in the MSDS that the vapors from the solvent were capable of traveling great distances to an ignition source and flashing back, a hazard defendant demonstrated through its MSDS that it was

aware of, and could have provided accurate and adequate warning labels at almost no additional cost. He opined that the failure of the defendant to provide The Brake Shop with written instructions on the safe use of the parts cleaner, coupled with the failure to provide an MSDS and adequate warnings, prevented the mechanics at The Brake Shop from being properly trained in the safe use of the parts washer. Dr. Zeliger's chemical analysis of the solvent sample taken from the parts cleaner on March 26, 1997, indicated that the chemical composition of the material analyzed was 99 percent Safety–Kleen Solvent 105, and less than one percent extraneous material consisting of isopropyl alcohol, methyl ethyl ketone and toluene (toluene is the primary component of Mopar aerosol brake cleaner, one of the brands of brake cleaners used at the Brake Shop).

Dr. Zeliger further opined that the fire originated in the parts washer, based upon the plaintiff's description of the incident, and the fuel source of the fire was the Safety–Kleen solvent vapors. Because the duration of the fire, estimated to have been approximately one minute, required an ongoing source of fuel, and because the nylon bristles of the solvent dispensing brush did not burn or melt, despite extensive fire damage to other components of the parts washer, Dr. Zeliger concluded that the machine was on at the time of the fire, and that the bristles were protected by the cooling effect of the liquid solvent coming out of the brush during the fire, and the ongoing source of fuel for the fire was the vapors from the solvent coming out of the brush. Dr. Zeliger ruled out the possibility that the ongoing source of fuel for the fire could have been brake cleaner vapors in the vicinity of the parts cleaner because brake cleaner vapors are highly volatile and would have burned in a "flash" fire that would have instantaneously extinguished and could not have continued to burn for one minute following ignition, as described by the witnesses. The ongoing source of fuel for the fire could not have been brake cleaner residue in the basin of the parts cleaner because due to the highly flammable nature of the brake cleaner, there would have been multiple explosions in the basin of the parts cleaner, which is not consistent with the eye-witness accounts. Further, the fire was described by Mr. Kapahnke as a steady flame at the time he put the fire out, which is consistent with the manner in which the chemical components (mineral spirits) of Safety–Kleen Solvent 105 are known to burn. Therefore, Dr. Zeliger concluded that the parts cleaner was on and running at the time of the fire.

Dr. Zeliger further testified that had the Safety–Kleen solvent been an "aqueous", or water-based, solvent as represented by the defendant, the fire could not have occurred inasmuch as an aqueous solution would not have been flammable or combustible. Because toluene, the primary component of some flammable brake cleaners, is insoluble in water, any toluene introduced into the parts cleaner during operation would have floated on top of the liquid in the solvent reservoir tank, and because the uptake for the pump was located well below the liquid surface, toluene would not have been dispensed during use and a fire could not have been started by its vapors.

Mr. Paul, the plaintiff's cause and origin expert, arrived at his own conclusions regarding the cause and origin of the fire following his inspection of the parts cleaner and his review of the deposition testimony statements of Armin Kapahnke and James Beauvais, the Safety–Kleen product information obtained through discovery, the Fire Marshal's reports and photographs, pleadings, answers to interrogatories and answers, requests for admissions, Material Safety Data Sheets, reports from UL and Factory Mutual testing, the deposition of the defendant's expert, Ronald Mullen, and photographs and materials obtained from Mr. Mullen's file. It was Mr. Paul's opinion, based on the testimony of the plaintiff and Mr. Kapahnke, evidence of fire patterns in photographs of the accident scene, and the nature of the fire damage within the parts cleaner, that the fire originated in the parts cleaner. His conclusions are based on the assumption that the parts cleaner was running at the time of the fire because the duration of the fire, estimated to be one minute, required an ongoing source of fuel, and the nylon bristles of the solvent-dispensing brush melted only slight-

ly, despite extensive fire damage to other components of the parts cleaner, suggesting that they were protected by the liquid solvent coming out of the brush during the fire. The ongoing source of fuel for the fire was the vapors from the solvent that was coming out of the brush.

In general, Mr. Paul formed his opinions following a methodology of systematically ruling out other possible causes. Mr. Paul's diagnosis of exclusion ruled out smoking based on the absence of testimony that Mr. Danise had been smoking at the time of the accident, the plaintiff's description of the fire, the nature of the burns on the plaintiff's body, and the lack of any physical evidence of charred cigarette butts near the parts cleaner.[1] He further ruled out cutting torches, welding equipment, and power tools upon the testimony of Mr. Kapahnke and Mr. Danise that none of those tools were in operation at the time of the fire or immediately prior thereto. External electrical causes such as the ground fault circuit interrupter wall outlet and extension cord were ruled out because the machine continued to run and produce fuel for the fire following the initial explosion. Had the fire been ignited by an external electrical source, the ground fault circuit interrupter would have tripped the circuit breakers, thereby shutting off power to the parts cleaner and stopping the flow of solvent through the brush, which would have resulted in melting of the bristles. Mr. Kapahnke testified that he turned off the circuit breakers and the machine itself immediately after putting out the fire.

Having ruled out these other possible sources of ignition, Mr. Paul determined the cause of ignition to have been an intermittent locked or impeded rotor condition in the electric motor which produced a spark that ignited the solvent vapors. Mr. Paul's reasoning was based upon the circumstances of the parts cleaner servicing. Although the

parts cleaner was delivered to The Brake Shop on March 25, 1994, no service was performed until August 25, 1994, more than 20 weeks after delivery. This was the only service performed by the defendant in the entire seven month period between the delivery and the explosion and fire. The defendant's own directions for assembly and use recognize the propensity for the impeller to become clogged with debris in that the instruction manual instructs the user to "unscrew the end cap from the pump and clean away debris with the parts cleaner brush until the impeller spins freely." The testing of the parts cleaner by Factory Mutual service revealed a locked rotor condition could raise the external temperature of the motor to 232 degrees Fahrenheit, and testing by Underwriters Laboratory revealed that a locked rotor could raise the external motor temperature as high as 253 degrees Fahrenheit.

Mr. Paul's theory is based on the tendency of the parts cleaner, during day to day use, to accumulate grime, dirt, and "gunk" that wash off the parts being cleaned and drain into the tank with the solvent. The gunk is then repeatedly cycled back up through the pump along with the solvent. As the buildup of gunk accumulates, there is an increased potential that the gunk will clog and impede the impeller and create an intermittent locked rotor condition or an impeded rotor condition, which causes the temperature in the motor to increase. As this occurs, insulation on the various wires of the motor and power cord deteriorates or breaks down, creating the potential for arcing between the thousands of tiny electric wires that make up the windings of the motor or between the wires of the power cord. The lack of proper and timely maintenance by the defendant, he opined, resulted in a buildup of gunk, which clogged the impeller to the point where an

---

1. Although there are now two stubbed-out cigarette butts in the lower tray of the parts cleaner, there is some controversy as to when or how they came to be there. This Court accepts as credible Mr. Paul's testimony that had a cigarette been the ignition source of the fire, the remains of the cigarette butt would have been charred. The Court observes, however, that one of the two cigarette butts in the tray of the parts cleaner shows distinct signs of charring. At trial, Mr. Kapahnke testified that he did not know one way or the other whether Mr. Danise was smoking at the time of the incident, and that he did not recall telling the Fire Marshal that he had seen Mr. Danise smoking prior to the incident. Mr. Danise testified that he was not smoking at the time of the fire.

intermittent locked rotor condition or impeded rotor condition occurred. This condition resulted in an intermittent seizing or impedance of the impeller such that, although solvent continued to be pumped through the brush dispenser, the electric motor had to work harder to free the impeller. Mr. Paul testified that the increase in temperature and current then resulted in an arc in the copper windings of the motor or the wires of the power cord, causing a spark that ignited the solvent vapors.

In order for the solvent vapors to have ignited, however, the liquid solvent would have had to have been elevated to a temperature above its flash point—105 degrees—thus, resulting in the evaporation of the liquid solvent and production of ignitable vapors. Ignitable mixtures occur when concentrations of vapors in air are within a definite percentage range, which by definition is between the lower explosive limit ("LEL") and the upper explosive limit ("UEL"). The actual vapor concentration conditions inside the pump motor enclosure are unknown, and Mr. Paul did not conduct any experimentation to determine whether a locked rotor condition could have produced ambient temperatures sufficient to raise the solvent temperature high enough to produce an ignitable vapor concentration.

Mr. Paul interpreted photographs obtained from the file of the defendant's expert depicting the condition of the motor and pump assembly "immediately after the incident" to document that the impeller and the end cap to the pump were heavily clogged with gunk at the time of the incident. Based on this evidence, Mr. Paul concluded that the intermittent locked rotor condition did, in fact, occur, resulting in a spark that ignited the solvent vapors.

The plaintiff's expert further suggested that because the buildup of gunk is clearly documented in the photographs obtained from Mr. Mullen's file, but this condition was not present at the time of Mr. Paul's inspection, this indicates that the parts cleaner had been tampered with during the time between the taking of the photographs and Mr. Paul's inspection. The Court concludes that because plaintiff's spoliation claim does not impact its conclusion, it is unnecessary to resolve it.

Defendant's expert, Ronald Mullen of the INS Investigations Bureau, Inc., testified as to his opinion of the cause and origin of the fire. Pursuant to his own examination of the parts cleaner, Mr. Mullen concluded that there was a fire event in the lower shelf area of the cart on which the parts cleaner stood, as well as some fire damage on the machine itself. He concluded that the machine was off at the time of the fire, the fire was not of long duration, the basin of the parts cleaner suffered only minor, superficial damage, and there was little damage to the physical components of the pump assembly of the machine. Similarly, he concluded that the walls and ceiling of The Brake Shop suffered only superficial soot and smoke damage. Because of his conclusion, based on his examination of the burn patterns on the power switch, that the machine was off at the time of the fire, his opinion was that the parts cleaner could not have been the cause of the fire, and nor could the solvent have been a source of fuel. Mr. Mullen found no evidence of electrical arcing, which would have resulted in molten or melted metal, or beading of metal in the immediate area of any arc, nor any discernable possible exit point of a spark. He also testified that the unit showed no evidence of any internal malfunction or internal overheating. Although Mr. Mullen conceded in a hypothetical that a localized, intense heat source could ignite the Solvent 105 even if all the liquid solvent had not reached its flashpoint temperature, he opined that the real situation is different in that the subject Solvent 105 was probably contaminated with substances such as flammable brake cleaner, and that under normal circumstances 100% of the solvent must reach the flashpoint temperature before the vapors exist in sufficient concentration to ignite. Mr. Mullen also opined that because the Solvent 105 was contaminated, the flashpoint of the solvent was lowered. The plaintiff's expert's chemical analysis of the solvent that it contained 99 percent solvent 105, however, was unrebutted.

### Examination of Parts Cleaner

In addition to consideration of the expert testimony from both sides, the Court, as fact finder, conducted its own examination of the Model 60 parts cleaner (Def.'s Ex. V) and the exemplar machine. The Court finds that the inside of the basin is roughened and pock-mocked with what appears to be more than merely superficial damage, contradicting Mr. Mullen's testimony that any fire in the basin simply swept-through and left only superficial damage. The Court also observes that the nylon bristles of the cleaning brush show only slight damage, whereas the brush-holder bracket shows significant blistering and pocking. The bottom of the basin also shows a protected area, lighter in color than the other areas of the basin, which would be consistent with the brush assembly lying on the floor of the basin, with the bristles oriented towards the brush-holder bracket.

Examination of the cart on which the parts cleaner sits shows smoke and fire damage to the lower tray area and the lid of the parts cleaner, which in scene pictures was in the lower tray area at the time of the fire. The fire pattern in this lower area shows indisputably that there was some sort of fire event in the lower tray area, with the greatest damage to the side of the tray directly beneath the pump and motor assembly. The upper right-hand corner of the lid (as it is oriented in the scene photographs) shows flaking, blistered paint with scorch marks. The underside of the lid shows similar smoke and fire damage, with a corresponding smoke and scorch pattern on the floor of the tray.

The cylindrical pump covering is relatively unscathed, but the area on top of the motor and immediately underneath the metal L-shaped enclosure shelf shows greater damage. The insulation of the grounding wires has been burned away, revealing the actual wires. The power cord, where it wraps around the motor, is melted and warped, with pocking and blistering. The top of the motor itself shows significant scorch marks, while the plastic label on the top of the motor is charred, curling, and illegible. The metal housing itself is roughened and dark on the areas immediately surrounding the motor. The plastic filter bag is entirely melted and deformed, and the rubber and plastic connectors are similarly melted. All these factors lead to the conclusion that there was likely a fire inside the actual metal pump enclosure, concentrated in the upper area above the motor.

The photographs of the fire scene, (Def.'s Ex. F, Ex. L, Ex. M), indicate that the area around the parts cleaner suffered substantial damage, with the damage to the wall reaching as high as the ceiling tiles. The Court accepts as credible the eye-witness testimony that the flames were several feet in height, and the duration of the fire was more than a few seconds, perhaps as long as a minute. This eye-witness testimony, coupled with the lack of damage to the nylon brush bristles and the significant damage to the brush-holder bracket leads the Court to conclude that the parts cleaner was likely in operation at the time of the fire. As the plaintiff's expert opined, the lack of damage to the nylon brush bristles is explained as the result of the cooling effect of liquid spurting out of the brush. The orientation of the brush in the bottom of the basin would suggest that the solvent would have been directed towards the brush holder bracket, thus explaining the substantial damage to that component. Finally, the high flame scenario described by the witnesses, and accepted by the Court is consistent with the machine being on at the time of the fire.[2]

### Conclusions of Law

#### 1. Adequacy of Warnings

 Even assuming, without deciding, that adequate warnings or instructions were not provided, within the meaning of Conn. Gen.Stat. § 52–572q, the Court concludes that the plaintiff has failed to prove that any defect in the warnings proximately caused his injuries, as required by § 52–572q(c).

---

**2.** A significant troubling aspect of this "on" scenario is the burn pattern on the on-off switch, which shows greater damage to the "off" side of the rocker switch. While the Court concurs with defendant's expert that the burn pattern on the switch suggests that the switch was in the off position at the time of the fire, this is however, inconsistent with the rest of the physical evidence.

■ "A product may be defective because a manufacturer or seller failed to warn of the product's unreasonably dangerous propensities." *Tomer v. American Home Products Corp.*, 170 Conn. 681, 689, 368 A.2d 35 (1976). Conn. Gen.Stat. § 52–572q governs the liability of the product seller due to lack of adequate warnings or instructions.

(a) A product seller may be subject to liability for harm caused to a claimant who proves by a fair preponderance of the evidence that the product was defective in that adequate warnings or instructions were not provided.

(b) In determining whether instructions or warnings were required and, if required, whether they were adequate, the trier of fact may consider: (1) The likelihood that the product would cause the harm suffered by the claimant; (2) the ability of the product seller to anticipate at the time of manufacture that the expected product user would be aware of the product risk, and the nature of the potential harm; and (3) the technological feasibility and cost of warnings and instructions.

(c) In claims based on this section, *the claimant shall prove by a fair preponderance of the evidence that if adequate warnings or instructions had been provided, the claimant would not have suffered the harm.*

(d) A product seller may not be considered to have provided adequate warnings or instructions unless they were devised to communicate with the person best able to take or recommend precautions against harm.

Conn. Gen.Stat. § 52–572q (emphasis added).

■ Thus, even though plaintiff's proof could arguendo have sufficed to show defective warnings, he enjoys no resulting presumption of proximate case. In *DeJesus v. Craftsman Machinery*, 16 Conn.App. 558, 548 A.2d 736 (1988), the Appellate Court of Connecticut upheld a jury's finding that despite inadequate warnings, there was no proof that the claimant would have avoided harm had adequate warnings been provided. "There is no presumption of proximate cause" that arises on the finding of failure to provide adequate warnings. 16 Conn.App. at 574, 548 A.2d 736.

Plaintiff's proof simply fails to persuade the Court that he or others in a position to prevent his injury would have acted differently in the presence of an adequate warning. In *Haesche v. Kissner*, 229 Conn. 213, 640 A.2d 89 (1994), the Connecticut Supreme Court upheld the grant of summary judgment that failure to warn of the dangers of engaging in "war games" using BB guns did not proximately cause the plaintiff's injuries. The Connecticut Supreme Court explained that in order for a lack of warning to have proximately caused the injury, the plaintiff must show that a warning would have altered his or her behavior in such a way as to prevent the harm that occurred.

Here, plaintiff claims that the warning label was inadequate to alert him to the risk of "flash back," that is, that the heavier solvent vapors could migrate great distances to an ignition source, including static discharge, and flash back, and that this risk was known to the defendant because defendant included it in the unsupplied Material Safety Data Sheet. The plaintiff also contends that the warning "do not smoke within 10 feet" of the parts cleaner is inconsistent with the information contained in the Material Safety Data Sheet and conveys to the user the false impression that it is safe to smoke in the vicinity of the parts cleaner as long as the smoker is not closer than 10 feet from the machine. Plaintiff further claims that the defendant failed to provide to him or his employer with information relating to proper maintenance of the parts cleaner and potential hazards associated with its use. The Court finds credible the testimony that Safety–Kleen never provided to the Brake Shop an instruction manual regarding proper usage or cleaning of the parts cleaner ("Instructions for Assembly and Safe Use").

Even assuming that the warnings were not adequate to the purpose of warning of the flashback potential or the danger of smoking near the machine, the plaintiff must still show that had the warnings been adequate he would not have been injured.

Plaintiff contends that because the defendant misrepresented to the plaintiff, his em-

ployer, Mr. Beauvais, and his co-worker, Mr. Kapahnke, that the solvent consisted of a nonflammable,[3] aqueous material, that this misrepresentation created the false impression that the solvent was perfectly safe and not capable of igniting under any circumstances. Had they not been misled, they testified, none would have used the machine, or gone near it. In fact, given the characteristics of the flashback phenomenon, particularly the risk of static discharge ignition, however, it is evident that the only way to definitively prevent the injury from such an occurrence is never to use or go near the machine. Mr. Beauvais testified that he relied upon the representations that the solvent was aqueous and nonflammable, and that had he known that the solvent was a combustible, hazardous material with a flash point of 105 degrees Fahrenheit, he would not have entered into the lease agreement. The Court does not find this credible inasmuch as Mr. Beauvais admitted that he did not know at that time the meaning of "aqueous." (Trans. at 38). Furthermore, after the fire, Safety–Kleen was permitted to deliver another identical model parts cleaner that used the same Solvent 105. Although this replacement machine was, according to Mr. Kapahnke, "rarely" used after the fire, it was nevertheless available for use and used in the Brake Shop. Mr. Kapahnke further testified that Mr. Beauvais refused to get rid of the parts cleaner, even after the accident, and also refused to purchase only non-flammable brake cleaner for his employees' use, unless it was on sale.

Finally, despite Mr. Beauvais's protestations that he did not understand the nature of the parts cleaner and solvent, he did sign the lease agreement in three places indicating that he had read the contents, which specifically explains that Solvent 105 is combustible material. The Court therefore finds that any representation about the solution being "nonflammable" or "aqueous" and any lack or inadequacy of any warnings, has not been shown to have affected Mr. Beauvais's decision to lease or keep the machine.

Mr. Danise also testified that had he understood the dangers of this machine, he would have quit his job, and thus avoided injury. The Court finds that this is not credible, given that Mr. Danise also testified that he had previously and extensively worked around Safety–Kleen machines with combustible solvent at two prior jobs, which he knew to be combustible, that appeared to be substantially the same as the one at issue in this case at two prior jobs. (Trans. at 105, 107–08; Def.'s Ex. A at 7). Thus his argument that he would have acted differently had he known that this solvent, too, was combustible is not persuasive, absent any evidence of changed circumstances since his last employment.

Mr. Kapahnke's testimony that he would have urged Mr. Danise to quit had he fully understood the danger of the machine is unavailing for the reason that if Mr. Danise's own prior experience with the machines did not cause him to quit his job, the Court has no basis for concluding that urging from a co-worker would have persuaded him to do so. Mr. Kapahnke's representation that he would have urged Mr. Beauvais not to lease the machine, and in his position as lead mechanic would have been persuasive, is similarly not credited for all the above reasons: Mr. Kapahnke had also worked around Safety–Kleen machines with flammable and combustible solvents previously, and he continued to use the parts cleaner with the Solvent 105 even after the accident, and was at the least unpersuasive in recommending to Mr. Beauvais that he remove the new machine from the shop after the accident. Moreover, it was Mr. Kapahnke who recommended the Safety–Kleen machine to Mr. Beauvais in the first place, based on his prior experience with a different Safety–Kleen machine that used a different, but also combustible, solvent, and before the "aqueous" representation would have been made, i.e., at the time of leasing. Also of some consideration is that fact that neither Mr. Danise or Mr. Kapahnke refused to use the flammable brands of brake cleaner provided by their employer, despite their

---

3. Any representation that the solvent was nonflammable would have been technically correct, as flammable liquids are defined as those having flash points below 100 degrees Fahrenheit. The Court, however, recognizes that in lay usage, the terms "flammable" and "combustible" are often interchangeable.

acknowledged awareness of the flammability of certain brands.

The Court is thus unpersuaded either that Mr. Beauvais would have refused to lease the machine either on his own counsel or that of Mr. Kapahnke's, or that Mr. Danise would have refused to work around the machine had there been adequate warning of the flash back propensity. Thus the plaintiff has failed to prove by a preponderance of the evidence that an adequate warning would have prevented his injuries.[4]

### 2. Common Law Misrepresentation

■ As discussed above, the Court's finding that Mr. Beauvais's assertion that he would not have leased the machine had he fully understood the dangers is not persuasive. The absence of reliance on any misrepresentations precludes a finding that the defendant is liable to the plaintiff for his injuries pursuant to Conn. Gen.Stat. § 52–572m under the common law theory of misrepresentation. *See Johnson v. Healy,* 176 Conn. 97, 101, 405 A.2d 54 (1978).

### 3. Breach of Express Warranty

■ Plaintiff further contends that the statement made by defendant that the solvent consisted of a nonflammable, water-based material was part of the basis of the bargain between Mr. Beauvais and the defendant and thus constituted an express warranty that the solvent was, in fact, nonflammable and water based, and had the solvent conformed to this express warranty, the explosion and fire would not have occurred. In order for a statement to form part of the basis of the bargain between parties, the buyer must demonstrate that he relied on the statement. *See Dondero v. Kasheta,* 1997 WL 120342 (Conn.Super.1997) (lack of reliance on defendant's statement precludes finding of breach of express warranty); *see also Hamon v. Digliani,* 148 Conn. 710, 174 A.2d 294 (1961) ("Where the manufacturer or producer makes representations ... the manufacturer or producer should be held to strict accountability to any person who buys the product *in reliance* on the representations...") (emphasis added). For the same reasons as explained above, however, the Court does not find that the plaintiff has proved by a preponderance of the evidence that the representations made by the defendant were relied upon by Mr. Beauvais in purchasing the parts cleaner, and thus there was no breach of an express warranty.

### 4. Breach of Contract Theory and Negligent Failure to Service

■ The lease agreement contained a provision requiring the defendant to service the parts cleaner "every 12 weeks." Plaintiff contends that the defendant breached the service agreement by failing to service the parts cleaner within 12 weeks of delivery, and by only servicing the parts cleaner once during the seven month period of time between the date of delivery and the date of the explosion and fire, proximately caused plaintiff's injuries in that the failure to properly service the parts cleaner led to an accumulation of debris in the solvent which in turn resulted in the pump impeller being clogged with debris. This condition is claimed to have resulted in an intermittent locked or impeded rotor condition that caused the temperature in the electric motor to increase and over time in turn caused the wires in the power cord to deteriorate permitting arcing or sparking, which ignited the vapors from the solvent.

While the Court accepts plaintiff's expert's theory as a plausible one, on this record it is merely that: theory lacking evidentiary corroboration. While the Court accepts that "gunk"[5] could have caused a locked or impeded rotor condition, and that this condition could have raised the temperature of the motor itself, and that a locked rotor condition

---

4. The Court does not address any arguments concerning the adequacy of the warning concerning smoking hazards inasmuch as the plaintiff contends he was not smoking at the time of the incident.

5. The Court, on its own inspection, did observe dried gunk in the impeller. Moreover, the instructions for the parts cleaner specifically recommend that the user "clean away debris ... until the impeller spins freely," (Def.'s Ex. S), suggesting the distinct possibility that the impeller can become clogged.

could have eventually resulted in an arc or spark from exposed touching wires sufficient to ignite a flammable concentration of vapors, and that agitation of the solvent could have contributed to the vapor formation process by accelerating evaporation, this series of "could haves" is not equivalent to establishing by a preponderance of the evidence that such a sequence of events did happen. Moreover, the plaintiff provides no evidence demonstrating that any of these events could elevate the surface liquid temperature sufficient to produce an ignitable concentration of vapor. The plaintiff's lack of any circumstantial evidence showing that an electrical arc or spark from the impeded motor was the source of ignition is particularly significant given the absence of any evidentiary vestige or artifact of these events, such as a point of exit for the spark, or beading of the wires where the arcing occurred.

The plaintiff claims that the actual existence of the fire constitutes evidence that the required temperature and vapor flammability concentration existed, and that because Mr. Paul's analysis excluded all other possible causes, the remaining possibility must be the true cause, even in the absence of objective evidence. This case, however, is a good example of why such a theory is risky, and an illustration of the flaws in using a diagnosis of exclusion. Where there are several possible sources for a fire, the fact of a fire does not substitute for evidence that the liquid temperature or vapor concentration was such that the intermittent locked rotor condition set in motion the chain of events that plaintiff theorizes led to the fire. Even accepting that certain kinds of faults, such as the high-resistance fault, would not likely leave any evidence, the plaintiff's argument nonetheless fails for the simple reason that in his diagnosis of exclusion, he has not excluded all other sources of ignition as possibilities. The plaintiff has not excluded the possibility, for example, that a spark or static discharge from outside the machine lit cascading vapors and followed the vapor trail back to the parts cleaner, causing both the fire damage in the lower tray and the fire damage in the

metal enclosure and basin—a possibility proposed by Dr. Zeliger in his testimony of the adequacy of the warnings.[6] Additionally, the plaintiff has not satisfactorily excluded the possibility that the fire had a smoking-related cause, particularly given the existence of a charred cigarette butt in the lower tray area.

For the foregoing reasons, the plaintiff has failed to prove by a preponderance of the evidence that more likely than not the fire injury was caused by electrical arcing resulting from a gunk impeded impeller. Thus plaintiff has not proved that the defendant is liable to the plaintiff for his injuries pursuant to Conn. Gen.Stat. § 52–572m.

Accordingly, judgment shall be entered for the defendant.

**IT IS SO ORDERED.**

---

6. The plaintiff has not pled or tried this case on any design defect case theory, i.e., that the inherent risk of cascading solvent vapors could and should have been accounted for in the product design.