[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 I. INTRODUCTION
This is an action for money damages arising from an office CT Page 1973 lease (hereinafter "the Lease") between the Substituted Plaintiff, Daniel J. Ferraina as landlord (hereinafter "the Plaintiff" or "Ferraina") and the Defendant, Industrial Health Care Company as tenant (hereinafter "the Defendant" or "IHC"). The Plaintiff claims the Defendant is indebted to him for (i) holdover rent; (ii) damage to the leased premises (hereinafter "the Premises") and expenses associated with the disposing of personal property left behind by IHC when it vacated; (iii) additional tax and operating expense amounts; (iv) prejudgment interest; and (v) attorneys' fees. IHC has asserted special defenses to the holdover rent claimed and has filed a counterclaim seeking reimbursement for (i) a portion of the holdover rent already paid by it; (ii) rent for two other months during the lease term which were paid by IHC, but which IHC now claims relates to months which were to have been rent-free; (iii) attorneys' fees and costs, and (iv) interest.
The subject lease (hereinafter "the Lease"), originally between Alice Ford Ferraina as landlord[1] and IHC as tenant, was of 3,781 rentable square feet of office space comprising a portion of a building located at 1095 Day Hill Road, Windsor, Connecticut. The term was for a period of approximately five years and six months commencing on March 20, 1993, and ending on September 14, 1998. The Lease was renewable for one additional term of five years upon written notice by tenant to the landlord not less than one hundred eighty days prior to the end of the first Lease term. IHC vacated the Premises about two months after the expiration of the Lease term, on November 19, 1998.
For the last thirty-five years, Ferraina has been engaged full-time in the business of managing commercial and other real estate properties owned by him, family members or family owned entities. In that capacity he has been involved in the construction of over one million square feet of building space, consisting of 35 to 40 separate buildings. At present, and in 1993, he owned approximately fourteen commercial buildings comprising approximately 250,000 square feet of space. At all times he has personally handled all lease negotiations involving properties owned by him, a family member or a family-owned entity. In most cases, he prepares the initial drafts of the leases himself, working from a form originally drafted by an attorney. He does not usually involve an attorney in the process of lease negotiation and drafting, and has a high degree of familiarity with all of the provisions of his leases, not just the basic business terms. CT Page 1974
The Lease was negotiated, drafted and finalized in accordance with these practices. The basic business terms were negotiated between Ferraina and IHC's then President, Samuel Paul, over a period of approximately two months. Ferraina prepared a first draft of a lease from a form on his computer and forwarded it to Mr. Paul. Following a series of revisions agreed to during the negotiation process, the parties ultimately executed the Lease.
IHC was the first tenant to occupy the Premises. The Premises were completely built out for IHC by the Plaintiff at a cost of approximately $125,000, including installation or construction of new carpets, new walls, new ceilings, new doors, new fixtures and new electrical wiring.
 II. PLAINTIFF'S CLAIMS A. HOLDOVER RENT
Paragraph 38 of the Lease provides as follows:
 HOLDING OVER: Should Tenant continue to hold possession of the Leased Premises without consent of Landlord after the expiration of the term of this Lease or any renewal thereof, Tenant shall become a tenant from month to month at three times the monthly rental and upon the other terms and conditions herein contained; provided, however, that such tenancy may be terminated, effective any day during such tenancy, by either party given written notice of the other. For the Tenant, such notice shall be delivered to the Landlord at least ninety (90) days prior to its effective date. For the Landlord, such notice shall be delivered at least fifteen (15) days prior to its effective date.
During Lease negotiations, Paul opposed the language of Paragraph 38 which triples the rent during a holdover by the tenant for at least three months given the 90 day termination notice requirement. Ferraina insisted on the terminology which he had included in every Lease he ever signed. Ferraina insisted on Paragraph 38 to dissuade the tenant from holding over and to give the tenant an incentive to leave. Back in 1993 when he was negotiating the Lease with Paul, Ferraina did not know what the market would be like and he considered that the market would improve. If IHC were going to holdover without his consent, Ferraina wanted to make sure he was prepared because "a holdover CT Page 1975 messes you up" and it is impossible to plan.
The Lease expired on September 14, 1998. IHC vacated the premises on November 19, 1998. It is undisputed that for the first holdover month IHC made one payment of triple rent in the amount of $12,726.93, but made no payments thereafter. The Plaintiff claims IHC is obligated for holdover or triple rent not just through November 18, 1998, when IHC vacated the Premises, but rather through December 31, 1998, when the Premises were re-let. Ferraina claims that under Paragraph 38 of the Lease, a holdover creates a new tenancy, of at least ninety days, subject to the landlord's (but not the tenant's) right to terminate tenancy with fifteen days notice. At $12,726.93 per month, the plaintiff claims IHC is liable for holdover rent through December 31, 1998, in the amount of $31,817.32. In its special defenses and counterclaim,[2] IHC claims Paragraph 38 is inapplicable because the holding over was with Ferraina's consent. IHC also claims the holdover clause is unenforceable because it is not a provision for liquidated damages but is a penalty.
 1. "CONSENT" OF THE LANDLORD
Paragraph 38 of the Lease, provides inter alia that the holdover rent provision is applicable to holdovers "without consent of" the landlord. In its first special defense, IHC claims that it held over with the landlord's consent, and therefore the holdover rent provision is inapplicable.
Approximately seven months before the expiration of the term, Ferraina wrote to IHC to indicate that, since he had not been notified of any intent by IHC to exercise its option to renew, "we will expect you to vacate the premises on or before September 14, 1998." On July 8, 1998, Ferraina again wrote to IHC, stating: "I must assume reluctantly that your firm will be leaving the premises on September 14, 1998." On September 9, 1998, still not having received a response, Ferraina wrote to IHC, stating: "Once again I am writing in an attempt to have you clarify for me the status of your tenancy." He further stated that: "we would like to think that we can lease your space, but have already lost opportunities as a result of your inconsideration," and: "Please remember that your rent increases to $14,076.93 on September 20 [sic — should be 14], 1998[3] and remains that way as long as you are in violation of your lease, which will after September 20 [sic], 1998, also require ninety days notice to quit." Sometime during this period, Ferraina did learn that IHC planned to move CT Page 1976 to other space, but was not informed of the timing until around September. In a letter dated September 14, 1998, Mark Vye, CEO of IHC stated that IHC planned to vacate "on or soon after November 1, 1998."
Mark Vye knew that the Plaintiff considered IHC in violation of the lease, knew the Plaintiff did not wish IHC to holdover, and knew the Plaintiff wanted IHC out on or before September 14, 1998. Clearly, Ferraina did not consent to IHC's holdover from September 15, 1998, though November 19, 1998.
 2. ENFORCEABILITY OF THE HOLDOVER PROVISION
It is well settled that a contract provision which imposes a penalty for breach of contract is invalid, but a provision which allows liquidated damages for breach of contract is enforceable if certain conditions are satisfied. Norwalk Door Closer Co. v.Eagle Lock Screw Co., 153 Conn. 681, 686 (1966).
 A contractual provision for a penalty is one the prime purpose of which is to prevent a breach of the contract by holding over the head of a contracting party the threat of punishment for a breach. A provision for liquidated damages, on the other hand, is one the real purpose of which is to fix fair compensation to the injured party for a breach of the contract. In determining whether any particular provision is for liquidated damages or for a penalty, the courts are not controlled by the fact that the phrase "liquidated damages" or the word "penalty" is used. Rather, that which is determinative of the question is the intention of the parties to the contract.
Berger v. Shanahan, 142 Conn. 726, 731-32 (1955).
The conditions which will justify an agreement for liquidated damages are: "(1) The damage which was to be expected as a result of a breach of the contract was uncertain in amount or difficult to prove; (2) there was an intent on the part of the parties to liquidate damages in advance; and (3) the amount stipulated was reasonable in the sense that it was not greatly disproportionate to the amount of the damage which, as the parties looked forward, seemed to be the presumable loss which would be sustained by the contractee in the event of a breach of the contract." Berger v.Shanahan, supra, 142 Conn. 732.
The Plaintiff contends that whether a liquidated damages clause CT Page 1977 is enforceable is to be assessed by the circumstances prevailing at the time the parties entered into the agreement. The Defendant contends the assessment is to be made at the time of the breach. They are both correct.
Whether a contractual provision should be construed as a proper liquidated damages provision or as a penalty is to be decided as of the time the contract was made. The conditions set forth inBerger v. Shanahan, supra, 142 Conn. 732, are assessed at the time the contract was made: "the damage . . . was uncertain in amount," "there was an intent . . . to liquidate damages inadvance," "the amount stipulated . . . as the parties lookedforward, seemed to be the presumable loss . . . in the event of a breach. . . ."(Emphasis added.) Id.
Even if I were to conclude, however, that Paragraph 38 of the Lease is a liquidated damages provision and that triple rent does not, in and of itself, render the provision a penalty and unenforceable,[4] that conclusion would not end the question of whether Paragraph 38 of the Lease is enforceable.
 In Miller v. Macfarlane, 97 Conn. 299, 302, 116 A. 335, [our Supreme Court] quoted with approval from The Colombia, 197 F. 661, 664, that `no provision in a contract for the payment of a fixed sum as damages, whether stipulated for as a penalty or as liquidated damages, will be enforced in a case where the court sees that no damage has been sustained..' . . . This principle finds approval in comment (e) of the Restatement, 1 Contracts § 339, where it is stated that `[i]f the parties honestly but mistakenly suppose that a breach will cause harm that will be incapable or very difficult of accurate estimation, when in fact the breach causes no harm at all or none that is incapable of accurate estimation without difficulty, their advance agreement fixing the amount to be paid as damages for the breach . . . is not enforceable.' (Citations omitted; emphasis added.
Norwalk Door Closer Co. v. Eagle Lock Screw Co., supra,153 Conn. 688. "This is so whether the contract provided for liquidated damages or for a penalty." Id., 690.
The relevant time at which to measure the plaintiff's damages is the time of breach. See, Vines v. Orchard Hills, Inc.,181 Conn. 501 (1980).[5] At the time of IHC's breach, the Plaintiff did not sustain damages which are either incapable of assessment or CT Page 1978 sufficient to enforce the draconian provisions of Paragraph 38.
On or about October 6, 1998,[6] the Plaintiff entered an agreement to lease 3900 square feet of the Premises with Murdoch Claim Management Company (hereinafter "the Murdoch Lease") at a Base Rent of $53,625.00 per year, payable in equal monthly installments of $4,468.75 plus operating expenses. The lease term commenced on January 1, 1999. A Work Letter attached to the Murdoch Lease as Exhibit B sets forth the leasehold improvements to be made by Ferraina. All work on the Work Letter was completed before Murdoch moved into the Premises on January 1, 1999. Had IHC given proper notice of its intent not to renew and had it vacated on September 14, 1998, when the Lease term expired, Ferraina could not have re-let the premises before September 15, 1998. Moreover, even if the Premises had been left by IHC in the condition required by the Lease, it is improbable that a new commercial tenant leasing 3900 square feet would have occupied the Premises on that date or within two weeks of that date. The Lease had been in effect for over five and a half years and had been built out to IHC's specifications. At the very least, the Premises would have shown normal wear and tear and would have required refurbishment for a new commercial tenant. Ferraina testified that if IHC had exercised its option to renew for an additional five years commencing September 15, 1998, he would have re-painted and re-carpeted the Premises. IHC made one triple rent payment for the holdover period in the amount of $12,726.93.
Under the facts of the present case, where the Plaintiff signed a new lease dated October 6, 1998, to commence January 1, 1999, and received sufficient rent from the Defendant to cover the period of its actual occupancy through November 19, 1998, and even beyond to December 15, 1998, and where a new tenant would not have entered the Premises until conditions resulting from normal wear and tear had been renovated, I find the Plaintiff did not sustain damage which is unascertainable and also find he was able to continue business substantially as he did before the holdover. Neither justice nor reason permit recovery of triple rent for three months. This is so whether the contract provided for liquidated damages or for a penalty. See Norwalk Door CloserCo. v. Eagle Lock Screw Co., supra, 153 Conn. 690.
Defendant in its counterclaim is requesting restitution of the excess rent paid in September 1998. The Defendant's claim for restitution raises interesting questions regarding burden of proof and the right of a breaching party to seek restitution of CT Page 1979 payments made in excess of damages actually sustained by the injured party. Those questions were explored and explicated by Justice Peters in Vines v. Orchard Hills, Inc., supra,181 Conn. 501. Suffice it to say, IHC does have the right to seek restitution of its payment. Under the circumstances discussed above, however, any reimbursement to which it is entitled is to be credited against the Plaintiff's damages resulting from IHC's unauthorized holdover and its failure to give timely notice to Ferraina of its intent to vacate as required by the Lease. True, the Defendant was not required to pay triple rent in September, but it was obligated under Lease ¶ 38 to give the Plaintiff ninety days' notice of its intent to terminate its holdover occupancy. The Defendant is obligated to pay as damages an amount equal to the rent the Plaintiff would have received for the period September 15, 1998, through December 14, 1998,[7] had IHC abided by the notice terms of the Lease and had it not held over without the Landlord's consent. The Murdoch Lease calls for payment of monthly rent in the amount of $4,468.75 which would total $13,397.25 for the 90-day holdover period. There is no dispute that IHC paid $12,726.93 leaving a balance owing to the plaintiff in the amount of $670.32.[8]
 B. ADDITIONAL TAX AND OPERATING EXPENSE AMOUNTS
Paragraph 8 of the lease provides that IHC is obligated to pay to the Plaintiff, as additional rent, its pro rata share of increases in real estate taxes and operating expenses (hereinafter sometimes "CAM"). Lease ¶ 8 provides that IHC was required to pay each month an estimated amount to be applied against its CAM obligation and that it is obligated to make an annual lump sum payment in the amount of any deficiency in its estimated payments as compared to its actual share of CAM escalation. At trial the parties were at odds as to the amount of CAM owed by defendant. Both now agree in their post-trial briefs that the amount of additional CAM owed by IHC is $2,593.00.
 C. CLAIMS RELATING TO CONDITION OF PREMISES
Under the terms of the Lease, IHC was obligated to "commit no waste on the Leased Premises," to make all repairs "made necessary as the result of misuse or negligence of Tenant," to "keep the Leased Premises clean and free from dirt and other refuse, and [to] make all repairs to the Leased Premises that are required as a result of any act or omission of Tenant, its agents, employees or invitees except to the extent Landlord is CT Page 1980 compensated under an insurance policy." Paragraph 18 of the Lease, moreover, provides as follows:
 CONDITION OF PREMISES: Upon the termination of this lease, Tenant agrees to remove its goods and effects and those of any other persons claiming under it, and to quit and deliver up the Leased Premises to Landlord peaceably and quietly in as good order and condition as the same are now or as hereafter may be improved by Landlord or Tenant, reasonable use and wear thereof and repairs which are Landlord's obligations excepted. Goods and effects not removed by Tenant at the termination of this Lease or within Seven (7) days thereafter, shall be considered abandoned and Landlord may dispose of them as it deems expedient, and Tenant shall promptly upon demand reimburse Landlord for any expenses incurred by Landlord in connection therewith.
The Plaintiff claims the Defendant violated its obligations under these provisions and seeks reimbursement for damages to Leased Premises and reimbursement of expenses.
 1. Property Left at Premises.
When IHC vacated the premises it left miscellaneous debris, including many large items of furniture, fixtures and equipment, including several workstations. The Plaintiff removed those items and is entitled to reimbursement for his expense.
 2. Damage to Premises.
When IHC left the premises, there were holes and substantial marks on the walls, and scratches on some of the interior doors. The carpet and floor tiles were damaged and/or stained and ttempts at cleaning them were fruitless. The condition of the walls, doors and flooring was not consistent with normal wear and tear. IHC also left behind a jumble of wires running above, through and under walls and hanging down from the ceiling tiles. Many of the ceiling tiles were damaged and had to be replaced. To remove the wiring and repair the damage, the Plaintiff incurred expense including advice and assistance from an electrician.
The Lease required IHC to make all repairs "made necessary as a result of [its] misuse or negligence," "to remove its goods and effects" upon vacating, and to leave the Premises "in as good order and condition as the same are now or as hereafter may be improved by Landlord or Tenant, reasonable use and wear thereof CT Page 1981 and repairs which are Landlord's obligations excepted." The uncontroverted evidence established that IHC breached those obligations.
 3. Plaintiff's Damages Re: Condition of Premises. In an action for breach of contract, the general rule is that the award of damages is designed to place the injured party, so far as it can be done by money, in the same position as he would have been in had the contract been performed. Bachman v. Fortuna, 145 Conn. 191, 194, 141 A.2d 477; Belisle v. Berkshire Ice Co., 98 Conn. 689, 700, 120 A. 599. There are no unbending rules as to the evidence by which such damages are to be determined. Lee v. Harris, 85 Conn. 212, 214, 82 A. 186.
Gordon v. Indusco Management Corp. , 164 Conn. 262, 272-73 (1973).
The plaintiff claims it expended and is entitled to be reimbursed the amount of $9,650.00 for the repair and repainting of walls and doors and $9,901.46 for installation of new carpet and tile. There was evidence that the walls, flooring and doors were in a state of disrepair well beyond normal wear and tear. Some, but not all, carpet and tile were badly stained and damaged and some, but not all, walls were damaged. The Plaintiff did not sustain its burden to prove that all flooring required replacement or that all flooring, walls and doors showed damage beyond ordinary wear and tear. Additionally, had IHC exercised its option to remain in the Premises, Ferraina would have repainted and replaced the carpet. Accordingly, the Plaintiff is not entitled to the entire amount claimed.
The Plaintiff acted as his own general contractor in restoring and repairing the Premises. The work was supervised and to a large degree performed by Ferraina's son, Craig Ferraina, who functioned as a working foreman, coordinating the work of subcontractors and personally performing much work himself. He testified that he expended approximately 152 hours in this regard. Ferraina testified, based on his substantial experience in working with contractors, that a reasonable hourly rate for a person performing the services which Craig Ferraina performed (characterized by Dan Ferraina as a "working foreman") is $55 per hour and that a reasonable overhead is 10-15%. In light of the Work Letter outlining the work for the Murdoch Lease, and Ferraina's testimony that the Work Letter items were completed by January 1, 1999, when the new tenant moved in, I find that not CT Page 1982 all 152 hours expended by Craig Ferraina as a general contractor during November and December were expended as a result of the condition in which the premises were left by IHC but were in large part hours expended to build out the Premises according to the Work Letter. For instance, there were requirements relating to bathroom fixtures, and insulated walls. Based on the Work Letter, the photographs and the testimony of the Ferrainas, I find the plaintiff is entitled to be reimbursed for the services it performed as general contractor in restoring the Premises for 80 hours of work at the rate of $55.00 per hour and $660 for overhead which includes truck expenses for a total of $5060.00.
One recognized measure of damages for breach of contract, applicable where, as here, "a party omits to do what he stipulated," is "the precise value of the thing which he contracted to do." Scribner v. O'Brien, Inc., 169 Conn. 389,404-05 (1975); see also Bachman v. Fortuna, 145 Conn. 191, 194
(1958). "Such value may often properly be shown by proof of what it would cost to perform the omitted acts." (Internal quotation marks omitted.) Bachman v. Fortuna, supra, 194.
The evidence established that Ferraina is entitled to recover the following out of pocket expenses and payment for the reasonable value of its services as General Contractor:
1. Repair/paint walls and doors $6,650.00
2. Replace carpet and tile $6,000.00
3. Electrician $ 286.20
4. Dumpster $ 199.07
5. General Contractor Fees. $5,060.00
 III. DEFENDANT'S CLAIMS AND CREDITS A. TRIPLE RENT OVERPAYMENT.
One of the claims for credit or reimbursement advanced in the Defendant's counterclaim arises out of its payment of triple rent for the period September 15 through October 14, 1998, during the holdover period. Although I have found the triple rent provision unenforceable for the reasons discussed above, I have considered the September triple rent payment in assessing whether the Plaintiff sustained harm from the holdover and/or whether the harm is ascertainable. In so doing, I have credited the overpayment in the amount of $12,726.93 to the damages due the Plaintiff for holdover. CT Page 1983
 B. SECURITY DEPOSIT
There is no dispute that the defendant is entitled to a credit or return of its security deposit in the amount of $8,192.16.
 C. RENT AND CAM PAYMENTS
The Defendant claims entitlement to credits for Base Rent ($4017.31) and CAM ($592.91) payments for March 1995 and March 1996 in the amount of $9,220.44. These claims require the Court to resolve ambiguities in the Lease.
Lease ¶ 3 provides in relevant part, "[T]he first month of the second, third and fourth year will be rent-free." The scheduled monthly Base Rent and CAM payments are set forth in tabular form in Lease Schedule B, which is incorporated by reference in Lease ¶ 3. Schedule B does not show March 1996 (the first month of the fourth year) as a free rent month. Schedule B shows CAM as owing for the "free rent" months, whereas Lease ¶ 3 does not refer specifically to CAM charges. Lease ¶ 42 states, "Any and all payments payable by Tenant under this Lease shall be deemed additional rent. . . ." The Lease in ¶ 44 provides that it "shall not be construed more severely against one of the parties than the other."
The Plaintiff concedes a credit is due the defendant for Base Rent for March 1995 ($4017.31) which was inadvertently paid by IHC. The Plaintiff, however, claims the Defendant is not entitled to credits for the March 1996 Base Rent payment or for the March 1995 and 1996 CAM payments because they were due and owing when paid.
Ferraina contends there is a typographical error in Paragraph 3 of the Lease in that the term "fourth year" (1996) should not have been included in the sentence "the first month of the second, third, and fourth year will be rent free." Ferraina points to Schedule B which sets forth a scheduled payment in the amount of $4017.31 for March 1996. The CAM charges are not referred to or included in the "free rent" provision of Lease ¶ 3 and are shown as due and owing in Schedule B for months when the base rent is waived.
The Defendant points to the language of the Lease which includes March 1996 (the first month of the fourth year) as a CT Page 1984 free rent month. In addition, IHC claims that CAM charges are deemed additional rent under the Lease and as such are not due in a free rent.
 Our Supreme Court has held that leases should be interpreted as contracts. Hatcho Corporation v. Della Pietra, 195 Conn. 18, 20, 485 A.2d 1285 (1985); Amwax Corporation v. Chadwick, 28 Conn. App. 739, 741, 617 A.2d 127 (1992). When construing the lease, `three elementary principles must be kept constantly in mind: (1) the intention of the parties is controlling and must be gathered from the language of the lease in the light of the circumstances surrounding the parties at the execution of the instrument; (2) the language must be given its ordinary meaning unless a technical or special meaning is clearly intended; (3) the lease must be construed as a whole and in such a manner as to give effect to every provision, if reasonably possible.' Hatcho Corporation v. Della Pietra, supra.'
Solomon v. Hall-Brooke Foundation, Inc., 30 Conn. App. 136. 144-45 (1993).
"If the language of the contract is not definitive, the trier may determine what the parties intended." Foley v. HuntingtonCo., 42 Conn. App. 712, 731, cert. denied, 239 Conn. 931 (1996). "When a court is faced with an issue of the construction of a contract containi ng inconsistent clauses, the parol evidence rule does not apply. Foley v. Huntington Company, Id., 733.
Ferraina testified that he handled all lease negotiations, that in the process he prepared a draft lease from one that was originally prepared by an attorney. It was he who typed the changes. There is a typographical error in the lease. It was not his intent to include the first month of the fourth year of the lease in the rent free provision, and it was not his intent to exclude CAM charges in the rent free months.
Bearing in mind the principles of contract interpretation stated above, I find the defendant is entitled to a total credit in the amount of $8034.62 for Base Rent inadvertently paid in March 1995 and in March 1996. The defendant is not entitled to a credit for CAM charges paid in those months as CAM payments were required under the terms of the Lease and Schedule B.
 IV. ATTORNEYS' FEES CT Page 1985
Both parties claim attorneys' fees under the Lease. The parties submitted itemized statements at trial in support of their claims.
Paragraph 30 of the Lease provides in relevant part as follows:
 In the event of a breach of this Lease, Landlord shall be entitled to recover from Tenant, as liquidated damages, the amount that would be the sum of all reasonable expenses of Landlord incurred in recovering possession of the Lease Premises and reletting the same including reasonable loss of rental due to vacancy, reasonable costs of repair of the Leased Premises, reasonable management agents' commissions and fees, reasonable court costs and attorney's fees as permitted under the Federal Bankruptcy Code, if applicable to the underlying breach of this lease.
Paragraph 50C of the Lease provides in pertinent part that "Landlord shall be responsible for all attorneys fees incurred by Tenant in enforcing its rights under this lease."
The Defendant apparently claims that attorneys' fees are only recoverable by plaintiff with respect to recovering possession of the leased premises. The language, grammar and punctuation of Lease ¶ 30 are sufficiently confusing as to permit this as one possible construction, but such a construction would violate the rule that, if possible, contractual provisions are to be construed in a way which renders the contract reasonable, rational and equitable. See, Lanna v. Greene, 175 Conn. 453, 458
(1978). Considering the Lease as a whole, I find the Plaintiff and the Defendant are entitled to reasonable attorneys' fees in accordance with their respective submissions. The Plaintiff is awarded attorneys' fees in the amount of $10,000.00; the Defendant is awarded attorneys' fees in the amount of $7,698.50.
 V. PREJUDGMENT INTEREST
Both parties seek prejudgment interest. The Lease does not provide for prejudgment interest.[9] Prejudgment interest at the statutory rate of 10 percent is recoverable where the other party has unreasonably detained money which is due. BlakesleeArpaia Chapman, Inc. v. El Constructors, Inc., 239 Conn. 708,734-35 (1997). In this case, as discussed above, there were several areas of dispute between the parties arising out of their divergent interpretations of acknowledged ambiguities in the CT Page 1986 Lease. Under those circumstances, I do not find that monies were unreasonably detained by either party and do not award prejudgment interest.
 VI. CONCLUSION
Judgment may enter in favor of the Plaintiff on the Complaint in the amount of $34,185.52 plus attorneys' fees in the amount of $10,000 and costs. Judgment may enter in favor of the Defendant on the Counterclaim in the amount of $28,953.71 plus attorneys' fees in the amount of $7,698.50 and costs.
Net judgment in favor of the plaintiff in the amount of $7,533.31 in accordance with Schedule A below.
 SCHEDULE A
Rent 10/15/98-12/15/98 $13,406.25 Additional CAM 2,593.00 Reimbursement for Repair of Premises 18,195.27
Subtotal 34,194.52 Attorneys Fees 10,000.00
TOTAL 44,194.52 Credit for Triple Rent (12,726.93) Credit for Security Deposit (8,192.16) Credit for March 1995 and 1996 Base Rent (8,034.62) Subtotal (28,953.71) Attorneys Fees (7,698.50) TOTAL CREDITS (36,652.21) NET DUE PLAINTIFF 7,542.31
By
Tanzer, J.